HUNTER SAVINGS ASSOCIATION,
Plaintiff,

v.

GEORGETOWN OF KETTERING LTD.,
W & F Investment Company, GWF Investment Ltd., Acme Precision Bldg.,
Ltd., Frederic E. Gagel, H. Garrett Frey,
John L. Evans, Jr., as Executor of the
Estate of Steven F. Williams, Deceased,
Joe Shump, Montgomery County Treasurer, Wilfrey Management Co., Defendants.

In the Matter of GEORGETOWN OF
KETTERING, LTD., Debtor.

Adv. No. 3–81–0324.
Bankruptcy No. 3–81–00700.

United States Bankruptcy Court,
S. D. Ohio, W. D.

Sept. 2, 1981.

Donald M. Lerner, Cincinnati, Ohio, John D. Squires, Dayton, Ohio, for plaintiff.

Thomas R. Noland, Dayton, Ohio, for defendant H. Garrett Frey.

William H. Wolff, Dayton, Ohio, for Joe Shump, defendant.

Susan D. Dlott, Cincinnati, Ohio, for defendant Evans.

Frank E. Cummingham, Cincinnati, Ohio, for GWF defendant.

Horace W. Baggott, Dayton, Ohio, for debtor.

Peter Donahue, Imperial Square, Ohio, for Central Trust Bank.

## DECISION

CHARLES A. ANDERSON, Bankruptcy Judge.

## PRELIMINARY PROCEDURE

On 29 August 1980, Hunter Savings Association filed a complaint in foreclosure in the Common Pleas Court of Montgomery County, Ohio against Georgetown of Kettering, Ltd. et al.

On 4 March 1981 an involuntary petition was filed by a partner in the Bankruptcy Court against Georgetown of Kettering, Ltd., an Ohio Limited Partnership, under 11 U.S.C. Chapter 11, in which an Order for Relief was entered on 1 May 1981.

The state court foreclosure suit was removed to the Bankruptcy Court on 19 May 1981.

Upon completion of pretrial discovery proceedings, and a pretrial conference on 25 June 1981, a pretrial order was finalized and entered on 20 July 1981, bifurcating the issues so that the only issues to be tried pertained to the action on the promissory notes, secured by real estate on the Chapter 11 *res*, reserving all questions as to disposition of the property to be resolved conformably to the Chapter 11 process and preserving all stays effective in the bankruptcy case, at the instance of the Bankruptcy Judge.

The matter is now before the Court upon the pleadings, the Pretrial Order, and the evidence adduced at a trial conducted on 20 July 1981.

## FINDINGS OF FACT

Plaintiff's complaint sues eight Defendants, as follows: (1) Georgetown of Kettering, Ltd., a limited partnership holding title to the multi-family apartment mortgaged to secure two promissory notes made to Plaintiff and the subject of the foreclosure action; (2) W & F Investment Co., a general partner of GWF Investment, Ltd.; (3) GWF Investment, Ltd., which holds the sole general partnership interest in Georgetown of Kettering, Ltd. and Acme Precision Bldg., Ltd.; (4) Acme Precision Bldg., Ltd., a limited partnership owning property on Findlay Street in the City of Dayton, Ohio, which property was mortgaged to Hunter under a guaranty agreement; (5) Frederic E. Gagel, a partner in GWF Investment, Ltd., and a comaker of the notes and mortgages in this action; (6) H. Garrett Frey, a partner in W & F Investment Co., and, also, a comaker of the notes and mortgages in this action; John L. Evans, Jr., as Executor of the Estate of Steven W. Williams, deceased, who held a partnership interest in W & F Investment Co., and a co-maker on the notes and mortgages in this action, who also signed as President of Wilfrey Management Co., a comaker.

Acme Precision Bldg., Ltd. filed a Chapter 11 Reorganization on 29 October, 1980 and GWF Investment, Ltd. filed a Chapter 11 Reorganization on 4 March 1981.

In early 1978, H. Garrett Frey, Steven Williams and Frederic Gagel formed a limited partnership known as Georgetown of

Kettering, Ltd. for purpose of acquiring a loan and purchasing the apartment complex known as "Georgetown of Kettering". Said partners initially sought a 9½% loan with Hunter Savings Association (Hunter). Gagel, Williams and Frey were negotiating with other lenders at the same time that talks were going on with Hunter. As a part of the negotiations Hunter represented they would make every effort to sell the contemplated $5,000,000.00 note and mortgage to the Federal Home Loan Mortgage Corporation ("FHLMC"). Frey, Williams and Gagel understood such sale to FHLMC would remove them from personal liability on the loan and entered into the loan transaction with Hunter on that basis. Hunter raised the rate of interest from the original 9½% level to 9¾% as a result of such arrangement.

The loan officers at Hunter admitted that they had not had experience with FHLMC previously but would draft all documents with the purpose of complying with the underwriting documentation requirements of FHLMC, with the purpose of eliminating the personal liability of the partners as comakers. Accordingly, the loan documents prepared by Hunters were forwarded to the partners early in February for their approval as to form.

On March 2, 1978, defendants, Georgetown of Kettering, Ltd. Steven F. Williams, individually, (now deceased and represented in these proceedings by defendant, John L. Evans, Jr., as Executor of the Estate of Steven F. Williams, Deceased), H. Garrett Frey, individually, and Frederic F. Gagel, individually, executed and delivered to plaintiff, Hunter Savings Association, their "Multi-Family Note" on a "FNMA/FHLMC Uniform Instrument", in the principal sum of Five Million Dollars ($5,000,000.00), with the added guaranties and security mentioned previously from other legal entities.

Also on March 2, 1978, the defendants Georgetown of Kettering, Ltd., the said Steven F. Williams, individually, H. Garrett Frey, individually, and Frederic E. Gagel, individually, executed and delivered to plaintiff, Hunter Savings Association, their note in the principal sum of One Hundred Fifty Thousand Dollars ($150,000.00), representing the amount of the loan not transferable to FHLMC.

Both of the mortgages were duly entered of record on March 3 in the office of the Recorder of Montgomery County, Ohio. The 5-million multi-family mortgage was on an FHLMC form, and the $150,000.00 mortgage was on a standard Hunter form.

Another document prepared by Hunter and executed simultaneously by the same parties on 2 March 1978 was a Mortgage Loan Modification Agreement to change the rate of interest chargeable in the event of default and the formula for calculation of "late charges" (referring to paragraph 3 and 4 in the $5-million note and covenant 19 of the mortgage), reciting that, "Hunter is contemplating a possible sale of the loan to Federal Home Loan Mortgage Corporation (FHLMC) in the future." The effect of the modification was to raise the default rates, prepayment penalty clause, and the acceleration upon sale and other contingencies, to make endorsement more appealing on FHLMC terms.

Another document prepared by Hunter and executed simultaneously by the same parties at the closing on 2 March 1978 was a Loan Agreement, required by Hunter augment to "terms and conditions given in the other instruments evidencing and securing" the $5-million loan. In pertinent part, collateral required in addition to the multi-family apartment complex (17 + acres of additional land and an industrial building at 215 N. Findlay Street, Dayton, Ohio) was to be released (before payment of the entire debt) "when this loan is sold to Federal Home Loan Mortgage Corporation (FHLMC)" or the lump sum payment of $150,000.00 for either of the extra properties. It was also provided that $200,000.00 of the loan proceeds would be held in escrow pending completion of a list of capital improvements (which was later disbursed); and, $200,000.00 would be held in escrow until verified actual rentals received from the apartment project "were, or will reach $1,000,000.00 for any twelve month period."

This latter $200,000.00 escrow fund was to be placed by Hunter in a six-month certificate of deposit at 6%. There were, in addition, several other extensive provisions one of which required the borrowers to deposit all security deposits for a year unto a Hunter passbook savings account as additional collateral and maintained at $33,000.00 for five years; and, to furnish to Hunter monthly financial statements and annual "audited statements" by March 31st of each year. The financial reports were never made in form satisfactory to Hunter, although over the years no formal protests were ever documented in writing until the letter under date of June 26, 1980.

Neither the loan agreement nor the loan modification agreement were entered of record in the County Recorder's Mortgage Records. Also, neither was incorporated by reference in the mortgages entered of record.

At the time of the origination of the loan on March 2, 1978, and subsequently, such a level of rental achievement would never have been reached from the mortgaged premises, at least prior to July 1, 1980. Under the said Loan Agreement, said $200,000.00 was to have been placed in a six-month Certificate of Deposit at 6% interest which was never done. The plaintiff held said funds in a separate deposit account, but credited interest thereon at the rate of 6% per cent per annum. After the loan went into default and was accelerated, and after this litigation was begun in the state court, said $200,000.00 escrow deposited was credited against the principal balance then owing to the $5,000,000.00 loan. Interest was credited on the account (January 5, 1979, February 7, 1980 and December 8, 1980) to Georgetown.

As of July 1, 1980, there were two unpaid installments of real estate taxes constituting a lien on the mortgaged premises. The total delinquent installments at that time amounted to approximately $90,000.00, exclusive of interest and penalties. A third installment would have become due and payable in June, 1980, and thus technically delinquent in July, 1980. These three installments of real estate taxes amounted to approximately $135,000.00, and all subsequent installments of real estate taxes are still due and payable and constitute a lien against the mortgaged premises, which lien has statutory priority ahead of plaintiff's mortgages.

At various times through May, 1980, the defendants Frey and Gagel requested the plaintiff to release the aforementioned $200,000.00 escrow for rent achievement for the purpose of payment of the delinquent real estate taxes (and other delinquent bills) of the mortgaged premises and other property, but plaintiff never did so. Defendant Georgetown sought release of the $200,000.00 for capital improvements by request of Steven Williams and H. Garrett Frey. Again, late in May, 1980, Frederic Gagel sought release of the $200,000.00 to pay accumulating debts, primarily for utilities, delinquent taxes and mortgage payments. Under a mistaken impression by Gagel from discussions with a Hunter Officer that the $200,000.00 fund would be released, a check from Georgetown for payment of the May, 1980 mortgage installment was drawn on 10 June 1981. All mortgage installments had been kept current from March 2, 1978 until May, 1980, although not made exactly on the first of each month, the contract date. When the anticipated release of the fund was not immediately forth coming, payment on this check was stopped, of which Hunter was notified on 17 June 1980.

By letter under date of June 25, 1980, Hunter was again requested to release funds by GWF Investments (a partnership composed of H. Garrett Frey, Frederic E. Gagel and John L. Evans, Jr., (Executor of the Estate of Steven F. Williams, deceased) in "amounts sufficient to pay past due and current, real estate taxes, and utility bills . . . and such amounts, if available, as to help meet current mortgage payments to Hunter."

A replacement check was tendered by Georgetown to Hunter on 15 July 1980 for the then past due mortgage installment, which was refused.

By letter dated June 26, 1980, the plaintiff notified only Georgetown of Kettering, Ltd. that it exercised its right to accelerate the balances then due on each of the two loans, on the grounds of failure to pay real estate taxes, and to provide financial reporting as required by the loan documents, as aforesaid. The interest rate was increased to twelve (12%) percent, and full payment was demanded within 60 days, at which time foreclosure proceedings would be instituted. Pursuant to previous conversations referred to among the parties, this letter provided a mechanism for all rent receipts to be segregated "rather than have Hunter exercise its present right to issue rent letters to Georgetown tenants." By letter under date of July 31, 1980, Hunter notified Georgetown that the assignment of rents provision to the mortgage was being exercised as of June 30, 1980.

After the foreclosure suit had been filed, Hunter credited the balance of the $200,000.00 "rent achievement" funds to the principal of the loan on 8 December 1980, after deducting certain charges. This transaction was backdated to September 1, 1980. The "standard" FNMA/FHLMC mortgage executed in the loan transaction contained a provision, as follows:

"Upon Borrower's breach of any covenant or agreement of Borrower in this Instrument, Lender may apply, in any amount and in any order as Lender shall determine in Lender's sole discretion, any Funds held by Lender at the time of application (i) to pay notes, rents, taxes, assessments, insurance premiums and other impositions which are now or will hereafter become due, or (ii) as a credit against sums secured by this Instrument. Upon payment in full of all sums secured by this Instrument, Lender shall promptly refund to Borrower any Funds held by Lender."

The delinquent taxes were left unpaid in deference to applying the funds to the principal of the loan.

Gagel, through a wholly owned corporation (Imperial Management, Inc.) was then authorized by Hunter to continue to collect the rents and turn them over to Hunter. During the term of this arrangement through July 18, 1981, the gross rental receipts substantially would have achieved the 1-million dollars goal (although subject to accounting technicalities and interpretations).

The rent achievement status and the problems of increasing operating expenses was the subject of repeated conversations between officers of Hunter and Defendants. Several possibilities were discussed, at various times, such as selling the Georgetown complex, converting to condominiums to take advantage of capital gains, revising the rent structures, and making accounting procedures more appropriate and efficient. Hunter condoned inadequate accounting reports during the course of the business relationship, in part upon the fact that a different computerized accounting program was promised and had been undertaken for Georgetown. Hunter did, nevertheless, convey repeated dissatisfaction with the state of financial reporting as required by the loan documents.

In light of the concerns over revising the rents and paying delinquent taxes, H. Garrett Frey made a demand to Hunter that Imperial Management, Inc. (Gagel) be removed as manager of the property pursuant to the applicable provision in the loan agreement, which was never implemented by Hunter. The most recent income and expense statement filed by the Debtor in Possession (for July, 1981) shows a gross rental and related income in the amount of $188,547.59, and a net income after payment of expenses in the amount of $23,337.55.

After the loan closing on 2 March 1978, and despite numerous conversations among the parties, and despite elaborate preparations and documentation, to the point of building the entire transaction around FHLMC forms and regulations, there is no evidence that Hunter made serious efforts to contact or sell the loan and mortgage to FHLMC, this despite subsequent urging by the comakers liable on the notes.

As of the date of the trial, (July 20, 1981) there was due and owing on the promissory notes executed to Hunter from Defendants, Georgetown of Kettering, Ltd., H. Garrett Frey, Frederic E. Gagel, and John L. Evans, Jr., as Executor of the Estate of Steven F. Williams, deceased, jointly and severally, the following principal sums, to-wit:

(a) On the $5,000,000.00 note, the principal sum of $4,737,507.45, plus interest at 12% per annum.

(b) On the $150,000.00 note, the principal sum of $147,982.86, plus interest at 12% per annum.

The interest and late charges prior to July 20, 1980, totalled $283,588.13 on loan (a) and $8,836.65 on loan (b). Delinquent late charges were computed in the amount of $4,084.20 on loan (a) and in the amount of $122.86 on loan (b).

## CONCLUSIONS OF LAW

The foreclosure action as removed to this Court was placed upon the trial docket with the understanding that the issues would be bifurcated and the question of liability of the Defendants would be separated from the question of sale of the real estate collateral which is substantially all of the Chapter 11 estate. The only issues to be tried were those pertinent to whether or not the promissory notes secured by two mortgages under foreclosure are in default; and, if so, the amount of the judgment on said causes of action. The Court also specifically excepted any question that the stay order be considered as lifted by implication or otherwise as to the Chapter 11 Debtor-in-Possession or as to the immediate sale of the property of the estate.

Within this framework, the Plaintiff has urged, (1) that it was entitled to accelerate its loans in June, 1980, due to multiple defaults by Defendant-Debtor, and the co-makers, and (2) that Plaintiff is entitled to judgment on the notes against all comakers individually, free of the stay imposed by 11 U.S.C. § 362.

Defendants, Georgetown of Kettering, Ltd., H. Garrett Frey, GWF Investment, Ltd., W & F Investment Co., and Wilfrey Management Co. deny both that there was any default and, also, the right to judgment against all defendants under any joint and several liability.

The issues as posed by Defendants have been stated as follows:

(a) Was sufficient consideration rendered by Hunter as to each Defendant to serve as a basis for an enforceable contract?

(b) If such consideration did exist, was any such consideration to any one Defendant or more of a type in which such performance was conditioned upon the performance of a promise by the other party, i. e., mutual conditions precedent, to which Plaintiff had an obligation first to honor before having any basis to complain of non-performance by a Defendant?

(c) If Plaintiff had furnished sufficient consideration to any such Defendant to remove Plaintiff's necessity of prior performance of promised acts, then did any of the facts so found create a default in the terms of the entire loan transaction?

(d) If default did occur by Defendant or Defendants, was there a right to cure said default and was any alleged default remedied or cured before any action or attempt to declare a default made or any attempt to accelerate the notes by Plaintiff?

(e) Did Plaintiff extend the time and manner of payment of any taxes or installments by Defendant and did Plaintiff give Defendant proper time to cure any alleged default prior to invoking an alleged acceleration?

The issues as submitted by the parties will be combined and then considered under different, slightly different semantics.

Looking to the facts, there is no doubt that the real estate taxes were delinquent as recited in the letter from Hunter to Georgetown accelerating the loan under date of 26 June 1980. There also is no doubt that all of the parties had acknowl-

edged that the financial and operating reports were not satisfactory to Hunter, although accounting programs were in the process of revision by the borrowers during the period of operation until Hunter began to handle the rent receipts.

In all other major aspects, however, the payment installments under the promissory notes and mortgages were reasonably current until the June, 1980 installment. Even here, payment was tendered on 15 July 1980 for the past due installment, which was refused by Hunter.

If the $200,000.00 fund held on deposit by Hunter pending a $1,000,000.00 per annum "rent achievement" had been released to the borrowers as requested on numerous occasions, there would not have been a delinquency in real estate taxes. Hence, the mortgages, as such, were never in serious default, in light of the total amounts of money involved and the manner of past dealings. In fact, on the date that Hunter refused the monthly installment payment tendered to replace the check on which payment had been previously stopped, the time lag was no longer than had been condoned on numerous previous occasions.

Under this state of the affairs, it does not seem insignificant that the interest rate was increased conformably to the mortgage and loan modification agreement for 9¾%, to 12% and penalties and, that the $200,-000.00 withheld funds were applied to the loan rather than to the delinquent taxes.

The entire business dealings among and between the parties is fraught with chronic bungling.

A careful perusal of the executed documents, from which the legal relationships must now be derived by this Court, definitely reveals no written time framework or covenants by Hunter to "sell" the loan to Federal Home Loan Mortgage Corporation, and thereby release the partners from personal liability as comakers. The entire structuring of the loan documents on and around FHLMC forms and regulations lends credence to the belief of these comakers that there would be a conscientious effort so made by Hunter.

## A

Reading the complex, and not always consistent, terms of all of the multifarious loan documents, there are certain conclusions which can be drawn as a matter of law and others which are drawn in by applicable equities.

As a matter of strict construction of these various documents it cannot be obviated that there was a default by the borrowers, in letting the taxes go delinquent. Further, even though the evidence establishes clearly and convincingly that the parties contemplated a sale of the loan to FHLMC, these negotiations and terms were never incorporated into the documents executed by the parties so as to create any conditions or qualifications on the enforcement of the liability of the comakers or the foreclosure of the mortgages. In the same vein, there is no question that the $200,-000.00 "loan achievement" was originally conceived and documented as a part of the scheme to satisfy FHLMC standards; or, that the failure to release such funds precipitated the foreclosure environment. None of the written contract terms, nevertheless, stipulated any rights of the borrowers thereto if the FHLMC negotiations were never implemented. No positive obligation was ever incorporated in the written documents placing a positive duty for Hunter to exercise specified efforts to sell the loan to FHLMC.

The documents clearly imposed a contract right to accelerate the loan without notice upon the failure to pay the real estate taxes by the mortgagor. *See 37 0 Jur.2d Mortgages § 320.*

## B

Having determined that the loan at issue is as a matter of law in default, it is necessary to refer to the facts vis-à-vis the Court's jurisdiction under the Chapter 11 Reorganization nexus and as a court of equity.

Before examining the equities involved, it is important to observe that the holder of

record title, Georgetown of Kettering, Ltd., as well as the defendants, Acme Precision Bldg. Ltd., and GWF Investment, Ltd., are subject to the Chapter 11 process and bankruptcy court exclusive jurisdiction, even though made party defendants, as comakers, in the foreclosure suit. Frederic E. Gagel, H. Garrett Frey, and Steven F. Williams, deceased, as individuals and comakers jointly and severally liable on the promissory notes secured by the real estate mortgage in foreclosure, are not personally subject to the exclusive jurisdiction of this Court. Hence, the automatic stay imposed by statute is not effective as to their personal liabilities.

No evidence whatever was submitted at the trial as to the value of the real estate mortgaged to secure the loan obligations. Likewise, no valuation evidence was submitted as to the valuation of other real estate owned by comakers and mortgaged as additional security on the Georgetown loan. No question or issue has been raised for a determination of adequate protection to the mortgagee during the administration of the Chapter 11 Reorganization process.

The implicit question remains, therefore, whether as a court of equity, with jurisdiction over both the *res* and all parties, this court shall impose a delay temporarily over postjudgment executions or orders in aid of execution to enforce personal liability against Defendants, Frederic E. Gagel, H. Garrett Frey, the Estate of Steven F. Williams, deceased, and GWF Investment, Ltd.

Within the context of the reorganization process the foreclosure suit, although sounding in state procedural law, is encompassed in the principles of adequate protection to the mortgagee/plaintiff. There is no evidence that the various items of real estate collateral and the income therefrom is not full and complete security for the loan balances. In fact, there is no evidence to the contrary.

The $200,000.00 escrow account is very crucial to the equities involved, not only as to the acceleration of the indebtedness of Georgetown, but, also, in the acceleration of the joint and several liability of the comak-

ers before the existence of a deficiency on sale of the real estate held as security for the loan. By clear and convincing evidence, the fact has been established that the original loan negotiations were designed to render personal liability as a last recourse in contemplation of sincere efforts by Hunter to "sell" the loan to FHLMC. The fact is equally clear that no serious attempt was ever made by Hunter to effect this contemplated relief to remove the personal liability of the comakers.

The adequacy or inadequacy of financial reports as to rent receipts and disbursements (even though never seriously pursued by Hunter since all mortgage loan installments had been kept current until the stop payment order on the check for the last installment), had become practically moot before a default was declared by letter under date of 26 June 1980 because Hunter had previously assumed superintendency over the rental income.

Assuming, *arguendo*, that Hunter had the right to set off the special "rent achievement" account to the loan balance, which is problematical, the fact is clear that the default for unpaid taxes would have been cured if these funds had been used instead to bring the tax installments current. Furthermore, an accounting as to the use and application of profits from rent receipts after the mortgagee took over these funds has neither been rendered to the comakers nor to this Court.

■ It is axiomatic that a Bank may apply a general deposit, or any necessary portion thereof, to the payment of a debt due it by the depositor. This principle does not apply if the deposit is specifically applicable to a particular purpose. The special purpose here was to assure a "rent achievement" of $1,000,000.00 per annum, primarily and originally as part of the inducement of sale to FHLMC.

One fact is significant. That is the cavalier manner Hunter assumed in handling this $200,000.00 fund. After the real estate taxes had been delinquent for at least eleven months (of which Hunter had knowl-

edge); and, after repeated requests from the mortgagor and comakers to obtain a release of sufficient funds to pay the delinquent taxes on the basis that the rent achievement had been substantially met (or was imminent) were denied; and after the loan obligations were accelerated and the higher default interest and penalties invoked—then, with unusual dispatch, the fund was commandeered for payment on the loan principal rather than the delinquent taxes, which remained a statutory lien superior to the mortgage lien.

As a matter of strict legal construction, it has been concluded heretofore that Hunter had no positive contractual obligation to distribute this fund to the mortgagor for the purpose of paying the taxes. This Court is constrained, nevertheless, to look to the very basic purpose of the mortgagee now under foreclosure.

■ Ohio has adopted the "lien theory" of mortgages. A court of equity looks to the real character of the transaction as security, and the mortgagor as the owner of the property, *Kerr v. Lydecker*, 51 Ohio St. 240, 37 N.E. 267; *Levin v. Carney*, 161 Ohio St. 513, 120 N.E.2d 92. Upon breach of the obligation secured by the mortgage, equity gives the right to redeem. The "equity of redemption" has also been made a statutory right in Ohio. A debtor may redeem property from sale upon payment of the judgment or decree, plus costs and interest, at any time before confirmation of a sale of the property. See *Ohio R.C. § 2329.33*.

■ The right of redemption is consistent with the bankruptcy court's exclusive jurisdiction over the property. Furthermore, the length of the redemption period and the imposition of personal liability against comakers in the Chapter 11 context should be influenced by the requirements of adequate protection to a mortgagee. See 11 U.S.C. §§ 362, 363, 364, 365.

■ The protection afforded to Hunter by the various items of property taken as collateral, including the real estate under foreclosure, serves to enhance the adequate protection, the same purpose as obtaining comakers for the loan; namely: as security for repayment. The bankruptcy court, as any court, will control the effect and execution upon its judgments to effect a proper purpose. Even though rendering a money judgment is now proper, the execution for collection herein will be governed by both the Chapter 11 process and the doctrines of equity. The foreclosure action must be merged into a mutual relationship with the purpose and process of the reorganization jurisdiction. See *Compton v. Jessup*, 68 F. 263, 279 (6th Cir. 1895) *and Moores Federal Practice and Procedure "Relief from Judgment or Order,"* ¶ 60.27[1].

■ Bankruptcy proceedings are inherently proceedings in equity. *Local Loan Company v. Hunt*, 292 U.S. 234, 54 S.Ct. 695, 78 L.Ed. 1230 (1933). The Supreme Court has noted:

"The power of the Bankruptcy Court to subordinate claims or to adjudicate equities arising out of the relationship between the several creditors is complete." *Sampsell v. Imperial Paper & C. Corp.*, 313 U.S. 215, 219 [61 S.Ct. 904, 907, 85 L.Ed. 1293] (1941). Further, "In the exercise of its equitable jurisdiction, the Bankruptcy Court has the power to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the Bankruptcy estate." *Pepper v. Litton*, 308 U.S. 295, 308, 60 S.Ct. 238, 246, 84 L.Ed. 281.

If the personal assets of the partners of the Debtor in Possession are exhausted by being sequestered by the mortgagee, who is already adequately protected by the Chapter 11 process and its lien on the Chapter 11 estate, there will be insufficient funds to propose a plan of reorganization for the benefit of other classes of creditors. In light of such efforts to avoid and defeat the court jurisdiction enacted for the potential benefit of all classes, the bankruptcy court may issue any order or judgment that is necessary or appropriate to carry out the provisions of the Bankruptcy Code pursuant to 11 U.S.C. § 105 and the All Writs Statute, 28 U.S.C. § 1651.

It is further the opinion of this court that Rules 54 and 62 of the Rules of Civil Procedure would be applicable in an action of the type *sub judice*, even if equitable considerations and the mutual purpose of the foreclosure action and the bankruptcy court jurisdiction were not implemented. Hence, any order which adjudicates "fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties." See F.R.C.P. 54 and 62.

These rules must be further read and applied in connection with the inherent power of courts to stay the issuance or enforcement of an execution arising from the general supervisory powers over their own process. See *Am.Jur.2d Executions, 692 for a general discussion, and Boynton v. Ball*, 121 U.S. 457, 7 S.Ct. 981, 30 L.Ed. 985.

In summary, the court has jurisdiction over all of the parties and over all of the property involved in both the foreclosure suit and the reorganization case. A money judgment should issue to Hunter Savings Association against the Debtor and all co-makers jointly and severally for the balance due for principal and interest on the mortgage loans being foreclosed, as a matter of law; but, execution and sale of the real estate is delayed until either consummation of the reorganization proceedings or a finding of a lack of adequate protection to the mortgagee. Until an order of sale is duly entered upon the foreclosure action or relief of the stay is granted in the Chapter 11 case, the equity of redemption shall be preserved and protected by the court in the foreclosure action. Until the expiration of the equity of redemption or the entry of an order in the Chapter 11 case authorizing the sale or conveyance of the real property of the reorganization estate, no action should be instituted to enforce the personal liability of the comakers and thereby interfere with the rights of the creditors and interested parties in the Chapter 11 case to have effected a fair and equitable plan of reorganization.

ORDERED, ADJUDGED AND DECREED, that a monetary judgment be entered to Plaintiff against Georgetown of Kettering, Ltd., Frederic E. Gagel, H. Garrett Frey, and John L. Evans, as Executor of the Estate of Steven F. Williams, deceased, jointly and severally, in the amount of $5,182,122.15, together with interest thereon at the rate of 12% per annum from July 20, 1981, and costs herein expended.

(2) ORDERED, ADJUDGED AND DECREED, that the order of sale in foreclosure should be, and is hereby, held under advisement pending the administration of the reorganization case and the equity of redemption shall remain in effect until further order herein to facilitate the prosecution of the reorganization case.

(3) ORDERED, ADJUDGED AND DECREED, that the monetary judgment rendered herein on foreclosure shall be stayed until further order herein to facilitate the prosecution of the reorganization case, and the protection to all interested parties afforded by the Chapter 11 process.