### In the Matter of The BRETHREN'S HOME, Debtor.

### Bankruptcy No. B–3–77–1676.

United States Bankruptcy Court, S.D. Ohio, W.D.

Oct. 26, 1982.

Harry W. Fravert, Dayton, Ohio, Trustee.

Gary W. Crim, Kenneth L. Bailey, Dayton, Ohio, M.M. Sayre, Cleveland, Ohio, for debtor.

John J. Dilenschneider, Columbus, Ohio, indenture trustee.

William H. Bertram, Jr., Greenville, Ohio, for Residents' Committee.

Kennedy Legler, Jr., Dayton, Ohio, for trustee.

Estabrook, Fin & McKee, Dayton, Ohio, for Bondholders.

Rose R. Tye, Dayton, Ohio, as Bondholder.

## DECISION AND ORDER

CHARLES A. ANDERSON, Bankruptcy Judge.

### FINDINGS OF FACT

A petition was filed by The Brethren's Home on 23 November 1977 in reorganization under Chapter X of the Bankruptcy Act. The principal liability shown was a first mortgage bond issue in the principal amount of $10,000,000.00, with a balance due on 31 July 1977 in the sum of $9,943,400.00. This issue, with approximately 2000 bondholders, had been in default since May, 1976. The First National Bank, Dayton, Ohio was the Indenture Trustee, and its proof of claim, filed 24 February 1982, evidenced a balance due on the bonds in the sum of $10,165,972.50 plus interest since November 1, 1977. The other overwhelming liability stemmed from approximately 380 fixed cost life care executory contracts for residents in the facility (rest and retirement home and health care center) for which no reserve fund had ever been established, thus a burden on current revenues.

Upon filing pursuant to Bankruptcy Rule 10–215(b), Maurice M. Sayre for Baker, Hostetler & Patterson, Kenneth L. Bailey and Gary W. Crim, as attorneys for the Debtor, duly filed a disclosure of compensation and retainer of $35,000.00, divided by $20,000.00 to Maurice M. Sayre, and $15,000.00 jointly to Kenneth L. Bailey and Gary W. Crim.

By order entered 23 November 1977, Harry J.W. Fravert was appointed as Trustee of the Chapter X Estate. By application and order entered on 12 December 1977, the Trustee was authorized to employ Kennedy Legler, Jr. (later of the law firm of Pickrel, Schaeffer and Ebeling) as attorney, who filed an affidavit conformably to Rule 10–211.

On 16 February 1978 the first meeting of creditors was held and adjourned until 16 March 1978.

By Application and Order entered 16 February 1978 The First National Bank was granted leave to be heard for bondholders as Indenture Trustee filed by the law firms of Estabrook, Finn & McKee, of Dayton, Ohio, and by Porter, Wright, Morris & Arthur, of Columbus, Ohio, under a general power of attorney executed and filed by the Bank.

On 16 March 1978 the Residents Committee of the Brethren's Home (formed in January 1978) and William H. Bertram, Jr. and John F. Marchal, of Greenville, Ohio, as attorneys for the Residents' Committee, filed statements conformably to Bankruptcy Rule 10–211.

Between the date of filing on 23 November 1977 and 23 March 1979 the primary activity of record in the case was routine administrative activities by the Chapter X Trustee and the Court. On 23 March 1979, primarily by insistence of the Indenture Trustee, proceedings were instituted by the Chapter X Trustee for authority to reject all executory contracts for life care of residents based upon lump sum payments previously made, set for hearing on May 16, 1979.

Prior to the hearing date on rejection of the contracts, the Indenture Trustee on 10 May 1979 filed a "Motion to Compel Reorganization Trustee to Charge the Standard Room Rates to Residents of Debtor Upon Rejection of the Executory Contracts Between Debtor and Said Residents," which was set for hearing on the same date, May 16, 1979.

Also set for hearing at the same session were applications for interim allowances of fees and expenses on applications filed by Harry J.W. Fravert, Trustee; Kennedy Legler, Jr., his attorney; and William H. Bertram, Jr., attorney for the Residents' Committee. All of these allowances requested for attorneys' fees were opposed by The First National Bank, as Indenture Trustee,

which sought a denial in part because "... any allowance of compensation and/or reimbursement of costs and expenses at this time would work a hardship upon the Debtor and jeopardize any possible rehabilitation of Debtor in this reorganization proceeding."

By Order entered 17 May 1979, interim allowances of fees and reimbursements were awarded as follows: $21,606.38 to the Trustee, $10,261.93 to the attorney for the Trustee, and $8,677.40 to the attorney for the Residents' Committee. Subsequent interim allowances were not opposed by the Bank.

On 6 July 1979 the Court entered a Decision and Orders rejecting the life care contracts, subject to and upon the award of damages, and prohibiting any future life care contracts. Because of the inadequacy of a monetary judgment to aged and infirm persons who had, in most instances, invested their entire assets with the Home and could not suffer even the threat of eviction, the damages awarded were based upon the actuarial values of their respective investments and eviction was prohibited until such amounts, as credited to the current occupancy rates charged to all other contracts, had been recovered. Most residents, despite the actuarial values of their initial investments, were required to augment by additional payments these monthly actuarial credits.

On 1 August 1979 (within Rule) First National Bank, Indenture Trustee, appealed the decision and order of actuarial damages and prohibition of evictions of the life care residents. The appeal designated 21 issues of fact findings, particularly those which tended to implicate the Bank in dissipation of funds applicable to maintaining life care contracts, or misapplication of reserve funds.

Because of the financial implications of the court decision on life care contracts, the Chapter X Trustee was forced to take extensions of time within which to prepare and file his Plan of Reorganization after the notice of appeal was filed and processed.

After August 1, 1979, the main activities of record in the case were administrative functions, until 18 May 1981, at which time a complaint was filed by The First National Bank, as Indenture Trustee, seeking leave to foreclose the lien upon the facilities, or in the alternative, adequate protection. On 4 June 1981 an answer was filed by the Chapter X Trustee, denying that the mortgage is a valid and subsisting lien on all of the property of the Home. On 9 June 1981 the Residents' Committee intervened and filed an Answer alleging a lien on the facilities superior to Plaintiff's Lien. On 15 June 1981 The Brethren's Home intervened and answered denying the alleged amounts due and owing, the allegations of default, and the alleged valuations.

Before a trial assignment on the relief from stay instituted by the Bank, on 14 August 1981 a Plan of Reorganization was filed by the Chapter X Trustee, based in great part upon the decision and orders of 6 July 1979, still pending on appeal. On 27 August 1981 the Indenture Trustee filed a Proposed Modification of the Plan filed by the Chapter X Trustee. On 12 November 1981 The Brethren's Home, Debtor, filed a Plan of Reorganization.

On 17 November 1981 an agreed order signed in behalf of all interested classes was signed by the Court clarifying and modifying the order of 6 July 1979, conditioned upon final confirmation of the Plan of Reorganization.

On 25 November 1981 the Plan submitted by the Debtor, and supported by the Reorganization Trustee and the Indenture Trustee, was found by the court to be the only Plan worthy of consideration and was submitted as a consensus Plan to the Securities and Exchange Commission for examination and report. The appellate proceeding was in the meantime settled and dismissed on the basis of the consensus Plan of Reorganization. After declination of the Securities and Exchange Commission to file a report and upon an evidentiary hearing on 1 July 1982 the consensus Plan was confirmed by the court.

During the course of the procedural delay occasioned by the appeal of the 6 July 1979 order, instituted by the Indenture Trustee, various interim allowances of fees and expenses were awarded by the court, without opposition, and the amounts involved will be noted and credited upon disposition of the pending applications for final allowances.

The principles and *ratio decidendi* applied in the decision and order on allowances for professional services in the case of *Matter of The Liberal Market, Inc.*, 24 *B.R.* 653, *(1982)*, will be adopted herein and incorporated by reference for the sake of brevity, although the references to sections of the Bankruptcy Code (Bankruptcy Reform Act of 1978) are not directly pertinent as such under Chapter X of the Act. The documentation of time devoted to the case has been carefully considered and applied as only one of the criteria employed. Also considered is the estimated need for limited professional services in closing the case.

Applications for allowances of professional fees and expenses in the total amount of $802,930.92 were set for evidentiary hearing on September 22, 1982. In addition to written general correspondence from certain bondholders not familiar with factual or legal details there was a general oral objection in open court in behalf of bondholders at the hearing. Concern was expressed as to both the total amount of fees requested in light of the results for bondholders and to duplication of efforts. No evidence was submitted by adverse interests in this regard or citation of case precedents.

I

The following specific fee and expense applications are now *sub judice,* to-wit:

1. By Harry J.W. Fravert, Chapter X Trustee (hereinafter Fravert), filed 12 August 1982, seeking a total allowance of compensation in the amount of $102,900.00 and reimbursement of expenses in the amount of $5,058.20 (including interim allowances in the amount of $40,000.00 compensation and $3,365.04 expense). Documentation has been made for a total of 2008 hours, with an estimated 50 hours additional time to close the estate.

2. By Kennedy Legler, Jr. (Pickrel, Schaeffer & Ebeling) attorney for Reorganization Trustee, (hereafter Legler) filed 12 August 1982, seeking a total allowance of compensation in the amount of $62,856.00 and reimbursement of expenses of $343.63 (including interim allowances of $27,500.00 and expenses of $261.93).

3. By Gary W. Crim, attorney for Debtor, (hereafter Crim) filed 12 August 1982, seeking a total allowance of compensation in the amount of $38,098.81 and reimbursement of expenses of $965.02 (including retainer and interim allowances of $28,178.91 and expenses of $965.00).

4. By Kenneth L. Bailey, attorney for Debtor, (hereafter Bailey) filed 11 August 1982, seeking total allowance compensation in the amount of $43,743.75 and expenses of $957.64 (including retainer and interim allowances of $24,187.50 and expenses of $957.64).

5. By Baker & Hostetler, attorney for Debtor, (hereafter Baker) filed 16 August 1982, seeking a total allowance of compensation in the amount of $184,930.00 and reimbursement of expenses of $5,802.89 (including retainer and interim allowances of $93,375.50 and expenses of $3,745.44. Documentation has been made for hours of services rendered of approximately 1600.

6. By First National Bank, as Indenture Trustee, (hereafter the Bank) filed 13 August 1982, seeking a total allowance of compensation and reimbursement expenses in the amount of $48,411.69.

7. By Estabrook, Finn and McKee, attorney for the Indenture Trustee, (hereafter Estabrook), filed 13 August 1982, seeking a total allowance of compensation in the amount of $99,455.15 and reimbursement of expenses in the amount of $2,609.07. Documentation has been made for 1,214.25 hours of services, including 33.75 hours for clerks and paralegals, charged to the Bank and paid. The applicant requests that all allowances be paid to the Bank.

8. By Porter, Wright, Morris & Arthur, attorneys for the Indenture Trustee (hereafter Porter) filed 13 August 1982, seeking a total allowance of compensation in the amount of $94,538.95 and reimbursement of expenses in the amount of $7,112.92. Documentation has been made for 1,146.50 hours of services charged to the Bank and paid. The applicant requests that all allowances be paid to the Bank.

9. By William H. Bertram, Jr., attorney for the Residents' Committee (hereafter Bertram), filed 12 August 1982, seeking a total allowance of compensation in the amount of $105,146.50 and no reimbursement of expenses incurred. Documentation has been made for 1,932.95 hours of services rendered. Interim allowances in the amount of $16,000.00 were credited.

For the sake of clarity, the total of fee applications will be addressed in terms of the respective individual requests. As a generality it must be observed that the extensive court proceedings *instanter* involve services rendered over a period from late 1977 to date—five years and thousands of hours—and that allowances should not only be considered in terms of an annual administrative cost, but also in terms of depreciated currency (save, perhaps, those amounts already advanced and credited to such costs). During the same period of time, other administrative in-house costs expended by the Home have been at least $21,000,000.00, which comparison should place the pending applications in perspective.

Another apt comparison was suggested by Estabrook's application in commenting that the combined requests for allowances in behalf of the Bank and its attorneys, although sizable amounts, represent "1.1% of the replacement value of Debtor's assets, less than 2% of the total debt, less than 3% of the principal due on the bonds, and approximate [sic] 5.5% of the Debtor's liquidation value."

Although these perspectives are not probative in applying the tests enunciated in *The Liberal Market* case, such references reflect indirectly upon results achieved.

The in-house expenses, furthermore, do not include other large expenditures for outside financial, accounting, and consultant costs. Hence, the total applications for legal expenses, (which have been instrumental in actually preserving the institution) as a cost of the entire administrative burdens before debt amortization would be less than 4 per cent, as an administrative burden. On a yearly basis, this very vital administrative cost could be prorated at only $160,000.00 or less per annum. Those responsible in years past for the dire and deplorable financial crisis of the Home, necessitating professional legal services, should praise the expertise and thousands of hours devoted to rehabilitation and mitigation of a greater tragedy.

The fact that objections made to the allowances were not supported by either evidentiary details or citations of legal precedents does not relieve the court of the mandated responsibility of examining carefully all claims and constitutes no test of the value or compensability. See *Matter of Detroit International Bridge Co. (C.C.A. 6th, 1940) 42 Am.B.R. (N.S.) 856, 111 F.(2d) 235;* See *Collier on Bankruptcy, 14th Edition* § 13.02, *and annotation 18.*

The attorneys for all parties exerted an admirable, concentrated effort to minimize time-consuming and endemic Chapter X procedural complexities, to the benefit of all interested classes. The time span for case administration was materially extended, nevertheless, by litigation (including an appeal) to defeat the actuarial results of the court decision back on July 6, 1979, upon rejection of life-care contracts.

Comparatively, upon retrospect, the Plan of Reorganization as eventually effected did not involve some complicated legal and financial factors usually involved in the typical Chapter X Reorganization.

Yet, all of the legal counsel participating performed commendable services appropriate to the expertise as espoused and within the guidelines discussed in the *Liberal Market* case. Particularly commendable was the persistent efforts by the Reorganization

Trustee, a certified public accountant by profession, in fostering a financial base for a viable reorganization despite the clash of conflicting interests and the litigation which impeded his submission of a Plan of Reorganization.

The *quantum meruit* aspects of the results obtained, however, must be carefully scrutinized in light of the residual financial plight still confronting the Debtor as an entity. Likewise the duplication of efforts and professional time expenses as to participating classes must be factually rationalized upon the broad perspectives of the *Liberal Market* criteria and the teaching of the Sixth Circuit Court of Appeals, especially as enunciated in *Cle-Ware Industries, Inc. v. Sokolsky, 493 F.2d 863 (1974)*. The documentation of time devoted as appended, after careful analysis, is one of the most vital criteria, among others, to be employed. The duplication examined pertains to intraclass efforts only, since the duplication among the classes is always conducive to a consensus Plan of reorganization. All classes were required to suffer a share of the hardships.

II

■ 1. The application of Harry J.W. Fravert, Reorganization Trustee, and his attorney, Kennedy Legler, Jr. (now the successor firm of Pickrel, Schaeffer & Ebeling) will be analyzed as one factor. The combined efforts will be allocated a total administrative burden to the reorganization estate in the sum of $160,000.00, plus expenditures advanced. The total allocation to the Reorganization Trustee should be allowed in the amount of $160,000.00 on the basis that most of the efforts by the Trustee required his expertise as a C.P.A. The composite hourly fee by his attorney is well within the applicable criteria for such services in the Chapter X "locality." The Trustee's total allowance is in the total amount of $100,000.00; and, the attorney's fee is in the total amount of $60,000.00, both including the necessary services to the date of a final decree herein.

The services and details of administration demonstrated by the contribution of the Reorganization Trustee and his attorney are applicable for comparative purposes in analyzing the other pending applications with respect to a determination of the "benefit to the estate" criterion. Since the trustee and his counsel are officers of the court charged with specific duties and responsibilities for the performance of which they are entitled to a fair and reasonable compensation, no further analysis is relevant beyond the commendations already expressed. See *In Re Farrington Manufacturing Co., et al., 2 B.C.D. (CRR) 427 (4 C.R. 1975)*.

2. The applications by the various law firms and all of the attorneys for the Debtor will likewise be allowed as one administrative factor and burden to the estate, giving due consideration to both the duplication of efforts and the results obtained, and the composite hourly rates applicable to the Chapter X "locality," for comparative contributions. (See *Liberal Market* for a discussion of the "locality" in the present context.)

■ All interim allowances as previously ordered and retainers are confirmed and an additional compensation is allowed as an economic burden on the Debtor in the amount of $100,000.00 for the combined services, to be allocated by the attorneys participating themselves according to their conclusions as to respective inputs of services and responsibilities. All expenditures advanced by each are reimbursable.

3. The applications by the law firms retained by The First National Bank of Dayton, as Indenture Trustee, must also be considered and allowed as one administrative factor and burden, together with the application of the Bank. In fact, the attorneys' applications seek reimbursement to the Bank for fees and expenses already paid and constitute *in toto* a part of the economic burden of the Indenture Trustee's participation.

A meticulous analysis of these combined applications discloses a very considerable duplication of both time expended and results obtained by astute and dedicated pro-

fessionals. Evident from the details presented, however, is the constrained conclusion that a major share of the time expended and results obtained were rendered for the special purposes and protection of the Bank itself, rather than the reorganization efforts. Certain "outside experts" were employed by the Bank for such purposes without court authorization.

By the same analysis, nevertheless, the value of the participation and contribution by the Bank in effecting a viable, fiscally sound reorganization cannot be obviated. In fact, perhaps the delays in case administration attributable to litigation precipitated by the Bank were not entirely counterproductive. Furthermore, the insight and eventual cooperation by and among the Bank and conflicting class interests were conducive to a consensus Plan which was not readily perceivable in 1977, when court jurisdiction was invoked. Another element not to be obviated in the application by the Bank is the fact, as Indenture Trustee, nearly $40,000.00 included for compensation and reimbursable expenses represents contractual fees in administering distributions to bondholders pursuant to the Indenture Agreement.

■ In other words, the Indenture Trustee and its attorneys deserve reasonable compensation for those "services which are beneficial in the administration of the estate, [and] for services which contribute to a Plan which is approved . . .", even though a portion of the contribution was not beneficial to the reorganization case.

■ Giving recognition to the positive results from the time and efforts contributed after rationalizing the criteria as enunciated in the *Cle-Ware Industries* case and this court's decision in *The Liberal Market* case a combined allowance is awarded to the Indenture Trustee as an economic burden of the Debtor in the amount of $170,000.00 plus expenses advanced by the Bank and the law firms. This allowance is comparable to the Chapter X Reorganization Trustee administrative factor, as explained in *The Liberal Market* decision. The Bank must allocate these proceeds as desirable and appropriate for its own purposes.

4. The legal services rendered in behalf of the Residents' Committee were rather unique and difficult to quantify. The extensive time and efforts documented substantiate the importance and dedication of the professional contribution; and, the hourly rates employed in computation are modest in the Chapter X "locality." Participating in the eventual results of maintaining a home for those aged residents not physically or mentally capable of coping with a traumatic disruption must be acknowledged and suitably recognized. As an element in the overall reorganization and eventual perpetuation of the Debtor, however, the financial or economic aspects are comparatively insignificant. On a *quantum meruit* analysis, the positive importance, effects, and contribution of the Residents' Committee waned after the Decision and Order entered by the court on 6 July 1979, awarding the residents a *sui juris* status as such. It is likewise difficult, as with the applications in behalf of the Indenture Trustee, completely to differentiate between efforts attributable to the reorganization and the extensive time devoted to the personal problems of the individual residents, both legal and psychological. Certainly, the extensive time devoted in connection with the July 6 decision and subsequent appeal by the Indenture Trustee must be honored.

■ Based upon the criteria discussed in *The Liberal Market* decision, the interim allowances as previously ordered are confirmed, and an additional compensation is appropriate in the amount of $60,000.00, which is comparable to the administrative expense factor of the attorneys for the Indenture Trustee for the contribution to the reorganization results (after crediting additional time-contribution factors).

■ The foregoing allowances of compensation will be payable upon journalization of a final decree herein augmented and increased by a factor of 8% per annum on advances by each applicant for actual and necessary expenses, computed as of the end

**344**

of the calendar year of advancement; and, the additional amount of 8% per annum on fee allowances from the date of the filing of the final decree herein conformably to Bankruptcy Rule 10–309(b) and Section 228 of the Bankruptcy Act.

 Another facet of administrative costs that must be resolved is the question of whether or not consideration should be given by the Court to assessing an administrative charge for the expenses of bankruptcy judge (or salary and expense fund), now passé. See Public Law 464, 79th Cong., C. 512, 2d Sess., June 28, 1946 and 73 Stat. 259. Section 241 of the Bankruptcy Act (11 U.S.C. § 641) makes such allowance discretionary to the Bankruptcy Judge or a District Judge, upon application, thus precluding a fee schedule promulgation by the Judicial Conference upon recommendations of the Administrative Office of the U.S. Courts. Since allowance is discretionary, this Court is of the opinion that application for an allowance is likewise discretionary, and makes none because of the losses already suffered by all interested classes and the dire need of the Home for all possible economic resources to remain viable. If counsel for the Debtor or the Trustee deems as a matter of law such an application is advisable, consultations should be scheduled forthwith with the Clerk of the Bankruptcy Court and the Bankruptcy Judge.