**In the Matter of GEORGETOWN OF KETTERING, LTD., Debtor.**

**Bankruptcy No. 3–81–00700.**

United States Bankruptcy Court, S.D. Ohio, W.D.

Feb. 18, 1983.

Horace Baggott, Jr., Dayton, Ohio, for debtor.

Donald Lerner, Cincinnati, Ohio, John D. Squires, Dayton, Ohio, for Hunter Sav. & Loan.

Thomas Noland, Dayton, Ohio, for H. Garrett Frey.

Jack Pickrel, Dayton, Ohio, for Creditors' Committee.

## DECISION AND ORDER

CHARLES A. ANDERSON, Bankruptcy Judge.

### PRELIMINARY PROCEDURE

This matter is before the Court upon "Request for Payment" filed on 5 March 1982. The request is essentially an application for fee allowance in the total amount of $22,100.00 filed by the Baggott Law Offices (hereinafter the Baggotts) for professional services rendered on behalf of Debtor documented by several pages of itemized professional services and time allocations. The Court heard the request on 22 June 1982. Note 11 U.S.C. §§ 330(a) and 503(b)(2). The interested parties subsequently submitted legal memoranda, as discussed below. The following decision is based upon the parties' memoranda, the evidence adduced at the hearing, and the court records.

### FINDINGS OF FACT

Frederic E. Gagel, Steven Williams, and H. Garrett Frey were business associates who formed a number of partnerships for the purpose of acquiring and operating various rental properties, most of which, including the instant Debtor, were residential apartment complexes. Each partnership possessed one of the properties as its principal asset. The partnerships were, in turn, "property" of a holding partnership, G.W.F. Investment, Ltd., which together with five of the partnerships, including the instant Debtor, are before this Court under separate Petitions for Relief. Mr. Williams is now deceased, and his partnership interests, insofar as is relevant to the instant proceedings, have subsequently been transferred to Mr. Frey.

Nearly all of these various proceedings have prompted a large amount of litigation, including internecine struggles among the partnership interests, vis-à-vis an overwhelming mortgage upon which there was potential personal liability against the individual partners. In the instant proceeding, the parties, along with the mortgagee in Debtor's property, were involved in two such adversarial proceedings, as discussed below.

On 27 April 1981, "Frederic E. Gagel, Managing General Partner of G.W.F. Investment, Ltd.," filed a consent to an order for relief in the Chapter 11 Case, which was then entered on 1 May 1981. Also, on 19 June 1981 H. Garrett Frey ("holding the entire ownership interest of W & F Investment Co., an Ohio partnership" which was the general partner in G.W.F. Investment, Ltd., with Frederic Gagel, who had filed the petition for relief against G.W.F. Investment, Ltd. on 4 March 1981) entered a consent to an Order for Relief in the Georgetown case, expressly reserving "all rights to file proceedings . . . to determine who shall serve as the Debtor-in-Possession in all five Bankruptcy estates."

The primary figure in the case was Mr. Gagel. Mr. Gagel is President of Imperial Management, Inc., a corporation created to maintain and manage various of the subject partnerships' properties. The instant proceeding was commenced by Involuntary Petition filed by Imperial Management, Inc., a scheduled creditor herein. Mr. Gagel also indorsed Debtor's Schedules in his capacity as partner of G.W.F. Investment, Ltd. Mr.

Gagel has also indorsed two proposed plans of reorganization in his capacity of "managing partner of G.W.F. Investment, Ltd." The attendant disclosure statement and various plan modifications were also indorsed as such. Throughout the record, Mr. Gagel frequently acted in his various capacities to indorse matters such as certificates of service and routine reorganization documents. The Court also specifically notes that Mr. Gagel and Imperial Management, Inc., both possessed scheduled unsecured claims, asserted against Debtor's estate, but both of which were disallowed by the Court.

The Baggotts have essentially requested payment for services which were beneficial to the interests of Mr. Gagel in his various capacities, including that of a partner to Debtor in Possession. Throughout the reorganization proceeding, the Baggotts served for and appeared in some of the court hearings as attorney of record for Mr. Gagel personally; for Debtor; for Debtor in Possession; for G.W.F. Investment, Ltd.; for Acme Precision Building, Ltd.; and for Imperial Management, Inc. (which was manager of the business operations of the Debtor and Debtor in Possession). "Horace W. Baggott" as "Attorney for the Petitioner, Imperial Management, Inc." indorsed the Involuntary Petition against Debtor. The Baggotts did not indorse either the Schedules or the two proposed plans of reorganization (or the documents attendant thereto), though the Court notes, as will be discussed, the Baggotts have requested allowance for their fees charges for services for preparation of these documents (all captioned as proposed by G.W.F. Investment, Ltd. and/or under the indorsement of Mr. Gagel in his capacity of "managing partner of G.W.F. Investment, Ltd," as discussed above). On 22 January 1982, the Court issued an Order confirming the Plan of Reorganization filed by Hunter Savings Association, as discussed below. On 16 February 1982, Horace W. Baggott, Jr., as "Attorney for Frederic E. Gagel," indorsed a "Motion to Reconsider" the Order of Confirmation.

In two adversarial proceedings related to the instant case, the Baggotts similarly are of record as attorneys for other parties in addition to Debtor. *Hunter Savings Association v. Georgetown of Kettering, Ltd., et al.* 14 B.R. 72, Bkrtcy.Ohio, 1981 was instituted by a prepetition Complaint filed in state court, which was removed to this Court by Application dated 19 May 1981. In this proceeding, the Baggotts indorsed answers (in the state court) and the pretrial order (in this Court) as attorneys for Debtor; G.W.F. Investment, Ltd.; Acme Precision Building, Ltd. (one of the partnerships allegedly owned by G.W.F. Investment, Ltd), and Mr. Gagel personally. In fact, a separate answer was filed by the Baggott Law Office on behalf of Mr. Gagel individually. In *Hunter Savings Association v. Georgetown of Kettering, Ltd., et al.* (Adversary No. 3–81–0638) the Baggotts indorsed the Answer therein as "Attorney for Georgetown of Kettering, Ltd., Frederic E. Gagel and G.W.F. Investment, Ltd." Even though judgment was awarded to Hunter in the foreclosure suit, this Court at the same time specifically stayed all executions on the judgment pending completion of the Chapter 11 process. See decision at 14 B.R. 72 (1981).

The Court notes that despite their representation of other interests, and particularly Mr. Gagel personally, the Baggotts did, nevertheless, appear throughout all related proceedings as attorney for Debtor and Debtor in Possession without objection by any interested parties, until the filing of the Baggotts' fee application. The Baggotts, however, did not file an Application for Appointment as attorney for Debtor in Possession until the belated filing of a Motion on 8 March 1982 requesting that the Court order appointment *nunc pro tunc* as of 3 March 1981 (the Court notes that Debtor's Petition was filed on 18 March 1981). The Court approved the Baggotts' Motion for Appointment (inadvertently overlooked by them) by Order dated 15 March 1982, in light of the fact that they had been appearing in all of the court proceedings since inception of the Chapter 11 case.

At this point in the case, the court had the advantage of analyzing the nature and

quality of the services rendered based upon complete documentation from the case records and the fact that no objections had ever been interposed to such legal services as attorneys for the Debtor (and Debtor in Possession). This hindsight distinguishes the apprehension confronting the courts in such cases as *In Re Sambo's Restaurants, Inc.,* 20 B.R. 295 (Bkrtcy.Cal., 1982); *In Re Paine,* 14 B.R. 272 (D.C.Mich.1981); and *In Re Fondiller,* 15 B.R. 890 (9th Cir., 1891). We particularly subscribe to the majority opinion in *Fondiller,* at page 892, in the emphasis (on different facts), as follows:

> "Gendel, Raskoff, Shapiro and Quittner does not hold or represent an interest adverse to the estate with respect to its duties as special counsel. We interpret that part of § 327(a) which reads that attorneys for the trustee may, 'not hold or represent an interest adverse to the estate' to mean that the attorney must not represent an adverse interest relating to the services which are to be performed by that attorney.

> .    .    .    .    .

> Any number of possible conflicts can be envisioned. The foregoing reasoning, however, does not apply to those situations in which an attorney's services are limited to a narrow field for a specific purpose. In the present case, the employment of Gendel, Raskoff, Shapiro and Quittner is limited to the search for, and attempted recovery of, specific assets allegedly concealed, and the investigation of certain alleged fraudulent conveyances. The firm's clients were not involved in those transactions. Therefore, the interests of the estate and the firm's clients are identical with respect to the firm's duties as special counsel."

It is important to note the metamorphosis of the Plan as eventually confirmed by the Court, as follows:

The Debtor, Georgetown of Kettering Apts, Ltd., by Frederic E. Gagel, Managing General Partner filed a Plan of Reorganization on 2 September 1981 and an elaborate Disclosure Statement amended three times. This Plan was premised on the belief that the liquidation value ($3,750,000) would provide no recovery for general creditors. The Plan proposed continued operation by the Debtor until the Debtor or a new partnership, composed of same partners, could sell a 51% partnership interest to implement a conversion of the 325 apartments to condominiums, with a projected going concern value of $7,914,000. The Plan proposed payment to all creditors, except the mortgagee (Hunter) in four years and the mortgagee in 5 years.

On 11 September 1981 H. Garrett Frey, holding a partnership interest in Debtor through G.W.F. Investment, Ltd., filed a Plan of Reorganization proposing to cure the default upon the obligations to Hunter on the effective date of the Plan, together with costs and interest at 9¾% per annum. Non-priority unsecured claims over $1,000.00 would be paid 20% on the effective date and the balance at the rate of 20% each successive year. Claims under $1,000.00 would be paid immediately. Frey would assume all ownership interests in Debtor, for providing the necessary capital, and would hold Gagel harmless from personal liability on the Hunter secured claim. The debts of all other associated partners, partnerships, and corporations would be subordinated to all other debts. This Plan was amended on 23 September 1981 to accelerate payments to the unsecured creditors over three years rather than five.

On 27 October 1981 Hunter Savings Association as Secured Creditor, filed a Plan of Reorganization, which provided in material part that in consideration of an effective conveyance to it by deed of general warranty it would release all liens against the property and relinquish all rights against Frederic E. Gagel, H. Garrett Frey, and the estate of Steven Williams, deceased, from their personal liabilities as comakers. General unsecured claims would be paid 50%. All unsecured "insider claims, as creditor and related entity claims as creditor" would not be allowed or paid. The Bankruptcy Court previously, on 2 September 1981, had awarded a judgment to the removed state court foreclosure suit to Hunter in the

amount of $5,182,122.15 against the Debtor and Gagel, Frey and Evans. Hunter filed an Amended Plan on 3 November 1981 increasing payments to unsecured creditors under $2,000.00 to 100%.

On 4 December 1981 G.W.F. Investment, Ltd., as owner of 99% interest in Georgetown of Kettering, Ltd., by Frederic E. Gagel, filed a modified Plan. This Plan proposed liquidation of the apartment complex by sale to buyers willing to pay $6,500,000 to $7,000,000 and from the proceeds to pay all creditors, except Hunter. The title to the property would be conveyed to a Trustee who would hold it until sold and then pay Hunter's mortgage in full, after $233,000 of the Debtor's funds "held" by Hunter had been returned.

Frey subsequently in open court withdrew his Plan and joined in Hunter's Plan. Gagel's Plan did not muster the required statutory acceptances, having been rejected by Hunter and Frey. Also, the application by the Attorney for Frey for payments of professional fees and incurred expenses was withdrawn in open court.

On 25 January 1982 the Court duly confirmed the Plan filed by Hunter Savings Association on 27 October 1981, as amended on 2 November 1981.

The Baggotts have requested fee allowances for services rendered in two proposed plans of reorganization. The plans were both proposed under the indorsement of G.W.F. Investment, Ltd. (and are hereinafter referred to as "G.W.F.'s first and second proposed plans") and were each essentially premised on the belief that Debtor could viably operate at a profit, or, in the alternative, that private sale of Debtor's apartment complex would infuse greater capital for the benefit of creditors than would routine liquidation of the property. G.W.F's first plan, filed on 2 September 1981, essentially provided for continued "operation" of Debtor by contemplated conversion of the apartment complex to condominiums and with retirement of secured debt by "sale or refinancing on the property and future earnings." The plan was proposed to offer creditors "maximum recovery beyond any amounts distributed through liq-

uidation" by full payment to all unsecured creditors within four years and to the mortgagee upon sale of sufficient condominiums. The second plan, filed initially on 23 September 1981 and amended on 4 December 1981, was specifically proposed as an alternative approach to G.W.F.'s first plan. The second plan was presented in the belief that the subject property would sell for considerably more through private sale than by liquidation. The plan included documentation of tentative purchase offers appearing to indicate the possibility of sale at the high end of the scale of the property's estimated fair market value. This plan proposed full payment to unsecured creditors immediately and payment to the mortgagee upon sale of the property.

A third plan of reorganization was proposed by H. Garrett Frey (hereinafter "the Frey plan") on 11 September 1981, and as amended on 23 September 1981. The Frey plan, as originally proposed, provided that Mr. Frey would obtain "a line of credit" in the name of Debtor in Possession for the purpose of curing the mortgage default and of enabling capital improvements, "including but not limited to" condominium conversion. Upon curing of the mortgage default, payments would then resume to the mortgagee under the original terms of the note. The plan, as originally proposed, also provided for immediate payment of all unsecured claims under $1,000.00 and full payment of other unsecured claims within five years. The plan, as amended on 23 September 1981, was essentially identical except that it increased payments to unsecured creditors by providing immediate payment to all unsecured claims under $2,000.00 and payment of all other unsecured claims in full within two years.

The Plan of Reorganization ultimately approved by the Court was proposed by Hunter Savings Association (hereinafter Hunter), the mortgagee of Debtor's apartment complex. The Plan was essentially a liquidation plan whereby Hunter received title to the property in exchange for a release of the principals from any personal liabilities they may have had to Hunter. By provision of the Plan, Hunter, as successor in interest to Debtor, also agreed to

assume Debtor's reorganization case administrative expenses. Hunter argued that its plan was the only "workable" plan because Hunter was the only interested party in a position to guarantee funding of a plan of reorganization. The Court also notes that the plan was originally filed on 27 October 1981 and subsequently amended on 3 November 1981. As originally proposed the plan provided for 50% payment of all noninsider unsecured claims. The amended plan changed this provision to provide for full payment of all noninsider unsecured claims under $2,000.00, and 50% payment of all unsecured claims over $2,000.00, but with a minimum payment of $2,000.00 of the latter.

Because of this assumption of liability, Hunter objected to this Court's appointment of the Baggotts as counsel for Debtor in possession on the grounds that:

(1) the Court lacks subject matter jurisdiction because not reserved in the Plan of Reorganization or Order of Confirmation;

(2) no formal application for appointment as counsel for Debtor in Possession was filed until after confirmation of the Plan of Reorganization;

(3) the Baggotts have never filed a "statement of compensation paid or agreed to be paid," as required by 11 U.S.C. § 329(a);

(4) the Baggotts have, as a matter of record, represented adverse creditor interests in the same ongoing proceeding, rendering the Baggotts ineligible because of representation of adverse interests, citing 11 U.S.C. §§ 327(a) and 328(c);

(5) much of the fee request is for services which did not enhance the estate, but instead served only Mr. Gagel's personal interests;

(6) Debtor's Schedules "have not been conducive to the proper administration of this case";

(7) the appointment would not be in the best interests of the estate;

(8) the compensation requested is "unreasonable" and not for "actual and necessary" services; and

(9) Debtor's counsel has ignored and failed to comply with Rules 215 and 219 of the Bankruptcy Rules of Procedure, and Interim Rule 2006.

The Baggotts respond that they rendered considerable service "in aid of administration of the estate and carrying out the provisions of the Bankruptcy Act, ... [including] maintenance of continuity of the administration of the estate which was supervised by the primary creditor, Hunter Savings." The Baggotts further argue that, "Under the Bankruptcy Code, [citing 11 U.S.C. §§ 503(a)(3)(D) and (4)], the Court is authorized to pay actual and necessary expenses of administration of which these fees are under [11 U.S.C. § 1107(b)]. The Court finds further authority and also under [11 U.S.C. § 329] of the Act."

The Baggotts have accordingly requested allowance of $22,100.00 for 221 hours of legal services times $100.00 per hour. The itemization of services includes all the above-described services, whether indorsed on behalf of Debtor, the administrative expenses of which Hunter has agreed to reimburse; G.W.F. Investment, Ltd., the administrative expense of which is presumably not provided for within the Plan, (though arguably overlapping as a holding partnership of the Debtor); Acme Precision Building, Ltd.; Imperial Management, Inc.; or Mr. Gagel.

The fee requests by the Baggotts are basically for services in preparation of the Petition, the Schedules, the two Plans of Reorganization proposed by G.W.F. Investment, Ltd., the objection to the Order of Confirmation, and the two adversarial proceedings.

The parties base their respective positions primarily upon statutory and bankruptcy rule provisions rather than citation of case precedents.

## DECISION

### I

Even though Hunter expressed sarcasm and cynicism as to the hourly *quantum* and

expertise of the services rendered, there is no doubt or question that the attorneys participated in all of the items of service claimed.

Furthermore, by express statutory guidance, it is certain that a bankruptcy court should not exercise discretion to deny reasonable compensation by summary disqualification because under 11 U.S.C. § 1107(b), "Notwithstanding section 327(a) of this title, a person is not disqualified for employment under section 327 of this title by a debtor in possession solely because of such person's employment by or representation of the debtor before the commencement of the case."

Even more pertinent, from the teaching of the Court of Appeals of this Circuit, this Court is constrained to follow the admonition that, "in order to avoid the double expense of attorneys' fees for bankrupt estates in this Circuit, we today announce the general rule that hereafter we will not approve the practice of appointing and compensating separate counsel for the debtor-in-possession and at the same time compensating the debtor's privately-retained counsel for legal services rendered after filing of a petition for a plan of arrangement. We see no valid reason, except in exceptional circumstances which we do not now foresee, why legal representation in both capacities should not be limited to one attorney or one set of attorneys."

Hence, the legal guidelines must be tempered in a Chapter 11 context by the reality that there is an inherent interplay of conflicts of interest. See *In the Matter of Cle-ware Industries, Inc. et al.* (C.C.A. 6, 1974) 493 F.2d 863; note also 11 U.S.C. § 1107(b). Both of the contesting parties have overexaggerated sound bankruptcy practice truisms, about which a bankruptcy court must exercise mature discretion.

The primary caution in any legal proceeding, especially in bankruptcy, is eternal vigilance to avoid the harmful influences resulting from conflicts of interest as to court officers and fiduciaries. The influences to be prohibited, nevertheless, are only the harmful influences within the realms of extreme practicality. Such was the thrust of the *Cle-ware* opinion. Such is the thrust of the statutory and bankruptcy rules cited by Hunter. Those citations, however, do not purport to extinguish the discretion of the court. All conflicts of interest are not void, but are voidable as the facts in a particular case may warrant. For instance, it should be obvious that Hunter, the objector, participated in several guises. It first participated as first mortgage holder and prosecuted a removed state court foreclosure suit to judgment against the Debtor and the partners on personal liability as comakers. At this point its interests were diametrically opposed to all other creditors and interested parties. Execution upon and sale of the Debtor's estate was stayed, however, by this Court in deference to the Chapter 11 process for the maximum protection of the other interested parties because Hunter as mortgagee was provisionally adequately protected.

The various Plans submitted by the principals of the Debtor expanded the perspectives, for the contemplated benefit and protection of the other interested parties not originally countenanced by Hunter. Obviously, at this point there were innumerable conflicts of interest as to all parties, although obviously not among the interests of the creditors not secured, including the "insiders." It was only after the Plans considerate of the other creditors and interested parties had been filed by the Debtor in Possession that Hunter submitted a Plan based upon these broader perspectives. It was these larger perspectives then encompassed by all of the submitted Plans that were conducive to an order by the Court confirming the Hunter Plan as being in the best interest of all parties.

At this juncture, however, it is important to note that the confirmation order was based upon the interplay of all conflicting interests and Hunter emerged as no longer the secured party, but as the successor to the Debtor in Possession. The personal liability of the partners and "insiders" had then been eliminated as a "conflict of interest." Under the plans submitted prior to

Hunter's Plan, there was no conflict of interest between the Debtor partnership and the individual partners as to this personal liability or as to maintaining a viable Debtor.

Note the 11 U.S.C. § 327(b) exception to the general rule on conflicts of interest in authorizing retention of professional persons that the debtor has employed if necessary in the operation of the debtor's business. See H.Rept. No. 95–595, P. 328, U.S. Code Cong. & Admin.News 1978, p. 5787, BKR–1 Ed, Legislative History § 82:16, P. 338. Note, also, the 11 U.S.C. § 327(c) compromise exception between the House of Representatives and the Senate as to previous representation of either a secured or unsecured creditor. See 95 Cong.Rec. H 11091 (September 28, 1978), BKR–L Ed. Legislative history § 81:3, p. 20.

If the Debtor partnership and the individual partners had not opposed the foreclosure suit of Hunter and if they had not submitted Plans of Reorganization contemplating a distribution to the other creditors, it is obvious that no creditor would have received any distribution from the estate either pursuant to a Plan or by liquidation under a Chapter 7 administration.

The conflicts of interest which may be construed as prejudicial to the consummation of a Plan in the best interest of these other creditors and interested parties, therefore, was between Hunter as first lien holder and all other parties. There was a community of interests among all parties other than Hunter. Hence, the alleged conflicts were more theoretical than real in final analysis, until the Hunter Plan was confirmed.

The function of this Court now is one of balancing these influences as against the *quantum meruit* contribution by the Baggotts to the Plan of Reorganization as confirmed. As to any legal services rendered which were entirely for the benefit of entities outside the successful Plan of Reorganization obviously compensation cannot be paid from the estate.

This Court concurs with the authorities and principles cited by Hunter in most respects, although the facts in the case *sub judice* dictated certain qualifications and mitigating results, which will bear comment as appropriate. (For the sake of avoiding excess citation of applicable precedents and legal principles, no distinction need be made between Bankruptcy Act (pre-1978) and Bankruptcy Code (post-1978) case precedents unless crucial to conclusions drawn, since most of the statutory provisions enacted by the 1978 Bankruptcy Code merely codify historical precedents).

One cardinal rule in the employment of attorneys by most parties-in-interest is court authorization or approval of such employment. The specific language in 11 U.S.C. §§ 327, 328, 1102 and 1103 requires debtors-in-possession continuing to operate the business, trustees, and official and unofficial committees to obtain court approval and appointment before their attorneys can be compensated or reimbursed from assets of the estate. It is noted that secured creditors, prefiling custodians, indenture trustees, and Chapter 7 debtors are not subjects of these statutory provisions.

11 U.S.C. § 327(c) does not interfere with inherent judicial discretion in the area of fee allowances, but merely removes all doubt from conflicts in historical precedents as to whether a denial of fees may be employed by a Court when appropriate as a penalty for reprehensible fee applications.*

The legal issues as propounded by Hunter and the scholarly analysis of traditional principles of law and case precedents must be applied herein with reference to the unusual and extenuated factual developments, with special attention to the fact that the Baggotts as attorneys were instrumental not only in the institution by the Debtor

---

* Note 11 U.S.C. § 327(c), which reads, as follows:

In a case under Chapter 7 or 11 or this title, a person *is not disqualified* for employment under this section solely because of such person's employment by or representation of a creditor, but may not, while employed by the trustee, represent, in connection with the case, a creditor. [emphasis added]

partnership of the subject reorganization proceeding; but, also did participate as attorneys for the Debtor throughout several complicated and time consuming trials, and in operating the business. The court judgments in these adversarials which were prosecuted by Hunter, as mortgagee, and in opposition to the various Plans of Reorganization submitted by the Debtor and the principals of Debtor impacted the metamorphosis of the development of a Plan which could muster statutory requirements and confirmation by this Court.

During the progression of all of the interrelated litigation, no opposition was ever interposed to the preparation or filing of pleadings and legal documents by the Baggotts and their appearances at the trials representing the Debtor and Debtor in Possession. Consequently, for the record this Court on March 15, 1982, entered an Order *ex parte* acknowledging this fact and formally appointing Baggotts as attorneys *nunc pro tunc* as of March 3, 1981.

On March 16, 1982, H. Garrett Frey filed an Application to appoint his attorney, Thomas R. Noland, as attorney for Debtor-in-Possession and an Objection to the *nunc pro tunc* order of March 15, 1982. This Application was in the capacity of an "ownership interest in W & F Investment Co., which is a general partner of G.W.F. Investment, Ltd., an Ohio general partnership, which is the sole general partner in the limited partnership, Georgetown of Kettering, Ltd." Previously, Thomas R. Noland on 8 March 1982 had filed an Application for attorney fees for services rendered which "directly resulted in benefit to the estate and creditors" without specifying a dollar amount. It is important to note that Noland's application was not prosecuted after Fry withdrew his Plan of Reorganization, to support the amended Plan filed by Hunter; and Fry has not contested Baggotts' request for payment now *sub judice.* (Although Mr. Noland withdrew his fee application, a portion of his services appear beneficial to factors which did contribute to the Plan of Reorganization as confirmed by the Court).

One cardinal rule always pertinent in the employment of professionals, including attorneys, to be paid from estate assets, is the mandatory requirement of court authorization or approval to serve. The specific language of 11 U.S.C. §§ 327, 328, 1102 and 1103 requires debtors-in-possession continuing to operate the business (as herein), trustees, and official and unofficial committees to obtain court approval and appointment before their attorneys can be compensated from the estate. It is noted that apparently secured creditors, prefiling custodians, indenture trustees and Chapter 7 debtors are not subjects of these statutory provisions. Such approval was ordered by this Court after a review of the record *nunc pro tunc.*

The crucial point overlooked by Hunter is that 11 U.S.C. § 328(c) ** does not interfere with inherent judicial discretion in the area of fee allowances, but is designed merely to remove all doubt, if any, from historical case precedents as to whether a total denial of compensation may be employed by a court when appropriate as a penalty for reprehensible and unscrupulous fee requests or for unauthorized services.

It is a very rare case for a court to order compensation for the services of an attorney who has not received court authorization to serve either initially or *nunc pro tunc.* Such discretion should always be exercised with extreme caution because of the harshness of depriving reputable attorneys of their very life blood. For instance, see *Laurent Watch Co., Inc.,* 2 B.C.D. 955 (CA 4, 1966) involving a *nunc pro tunc* order to avoid the harshness of such forfeitures to

** 11 U.S.C. § 328(c) reads as follows:

(c) Except as provided in Section 327(c), 327(e), or 1107(b) of this title, the court *may deny* allowances of compensation for services and reimbursement of expenses of a professional person employed under section 327 or 1103 of this title if, at any time during such professional person's employment under section 327 or 1103 of this title, such professional person is not a disinterested person or represents or holds an interest adverse to the interest of the estate with respect to the matter, on which such professional person is employed. [emphasis added]

attorneys who had rendered valuable services to the estate. As a matter of superintendency of estate administration, such apparent harshness must be the rule only if for the protection of the estate administration or the benefitted estate creditors.

Court discretion is also tempered and implemented in this regard by 11 U.S.C. § 1107(b) which recognizes the realities of a Chapter 11 case (as previously demonstrated by the facts in the *Cle-ware Industries* case), in providing that, "Notwithstanding section 327(a) of this title, a person is not disqualified for employment under section 327 of this title by a debtor in possession solely because of such person's employment by or representation of the debtor before the commencement of the case."

Court discretion as to controlling proper compensation is recognized again by statutory language which specifically grants authority, "If such compensation exceeds the reasonable value of any such services, the court *may cancel* any such agreement, or order the return of any such payment, *to the extent excessive....*" 11 U.S.C. § 329(b) [emphasis added].

Perhaps these conclusions are in more appropriate perspective if it is kept in mind that *Hunter* flatly opposes any allowance of fees whatever, as "secured creditor." The fact that the Debtor as represented by the Baggotts litigated interests conflicting with those of Hunter, including the foreclosure suit, is not now relevant. In fact, Hunter

ceased to be the secured creditor upon confirmation by this Court of the Plan of Reorganization. At this juncture, Hunter became the successor in interest of the Debtor and Debtor in Possession. Implicit as a matter of law from this changed status was Hunter's assumption of liability for all administrative priority claims. The integrity of the judicial process dictates that there be no *ex post facto* avoidance of such responsibilities as either the Debtor in Possession or as a secured creditor since the contribution of officers of the Court reach to the very heart of the judicial process. When Hunter took over all of the Debtor's assets pursuant to the Plan as confirmed, these assets were encumbered by all administrative costs having a priority over the claims of all unsecured estate creditors. See 11 U.S.C. § 507(a)(1). It is only a truism that Hunter did not submit a Plan of Reorganization for altruistic reasons. The disputed valuation of the estate property posed the threat of a "cram down" under 11 U.S.C. § 1129 and confirmation of one of the other Plans of Reorganization. Until a final decree conformably to Interim Rule 3010 is entered by this Court, Hunter continues in its entirely new status as successor Debtor in Possession.

Referring to Exhibit A attached to the fee request now in question, the following items are allowed as against the estate, namely:

| 1981 | EXHIBIT A | |
|------|-----------|---|
| 3–4–81 | Petition and consultation with client | 6 hours–Allowed |
| 3–16–81 | Statement or affairs and schedule/ preparation | 4 hours–Allowed |
| 4–3–81 | Application Debtor/turn over rents | 2 hours–Allowed |
| 4–3–81 | Application Hunter/turn over property | 1 hour –Allowed |
| 4–3–81 | Consultation regarding both preparations | 8 hours –Allowed |
| 4–14–81 | Objections of Hunter re; rents | 1 hour –Allowed |
| 4–16–81 | Correspondence/consultation with Client | 2 hours–Allowed |
| 4–27–81 | Consent, Answer Hunter/Application to compel | 1 hour –Allowed |
| 5–1–81 | Order of Relief, Application 205 Exam, preparation | 3 hours–Allowed |
| 5–2–81 | Application Order re; air-conditioning | 3 hours–Allowed |
| 5–15–81 | Agreed Entry, correspondence, Appoint Creditors' Committee | 1 hour –Allowed |
| 5–18–81 | Removal Petition – Hunter | 1 hour –Allowed |

| Date | Description | Hours |
|---|---|---|
| 5–19–81 | Research (3), Hearing, 205 Order, Application Debtor turnover Property | 6 hours–Allowed |
| 5–29–81 | Correspondence, Meeting with counsel re; pretrial Order | 3 hours–Allowed |
| 6–2–81 | Meeting | 2 hours–DENIED |
| 6–5–81 | Correspondence | ½ hour –DENIED |
| 6–6–81 | Fry Motion, Amended Answer, Order | 1 hour –DENIED |
| 6–8–81 | Hunter objection/turn over rents | 1 hour –Allowed |
| 6–9–81/ 6–10–81 | Hearings, Fry Consent | 10 hours–DENIED |
| 6–16–81 | Notice, Conference | ½ hour –DENIED |
| 6–22–81 | Conference with client | 2 hours–Allowed |
| 6–23–81 | Conference with lawyers | 2 hours–Allowed |
| 6–25–81 | Pretrial and client conference | 2 hours–Allowed |
| 7–1–81 | Gagel/Complaint and preparation | 1 hour –DENIED |
| 7–6–81 | Correspondence, Complaint for fee | 2 hours–DENIED |
| 7–10–81 | Hunter Motion, Pretrial Order | 1 hour –Allowed |
| 7–20–81 | Hunter Foreclosure, Hearing/Common Pleas | 7 hours–Allowed |
| 7–24–81 | Gagel Answer 0393 | 1 hour –DENIED |
| 7–30–81 | Brief of Hunter conference with Gagel | 3 hours–Allowed |
| 7–31–81 | Prepared Judgment –324– conference with Gagel | 3 hours–Allowed |
| 8–3–81 | Memo Contra 0324 | 2 hours–DENIED |
| 8–4–81 | Proposed Fact – Law – Fry | 3 hours–DENIED |
| 8–10–81 | Answer 0443 Conference/Gagel | 3 hours–DENIED |
| 8–19–81 | Supplemental post-trial brief/Fry | 1 hour –DENIED |
| 8–21–81 | Motion-proposed Order/Debtor | 2 hours–Allowed |
| 8–26–81 | Hearing—Motion for Extension/Disclosure Statement and preparation | 6–½ hours–Allowed |
| 9–2–81 | Plan of Reorganization | 10 hours–Allowed |
| 9–3–81 | Hearing of Motion to extend time Plan of Debtor, Consult with Debtor | 2 hours–Allowed |
| 9–8–81 | Status conference Court, confer with client | 3 hours–Allowed |
| 9–11–81 | Key Plan | 2 hours–Allowed |
| 9–16–81 | Conference re; Pretrial and client | 4 hours–Allowed |
| 9–22–81 | Motion-Relief of Stay, Complaint modify stay, Motion Dismiss | 3 hours–Allowed |
| 9–22–81 | Amended Schedules-examination preparation | 6 hours–Allowed |
| 9–23–81 | Motion Dismiss, Disclosure Statement and Plan | 3 hours–Allowed |
| 9–29–81 | Trial and pretrials-Debtor in Possession | 4–½ hours–Allowed |
| 9–30–81 | Trial and pretrials-Debtor in Possession | 7 hours–Allowed |
| 10–7–81 | Apple 205 Exam-Memo Contra Contempt | 2 hours–Allowed |
| 10–20–81 | Conference with client | 2 hours–Allowed |
| 10–26–81 | Reynolds claim and objections | 1 hour –Allowed |
| 10–27–81 | Answer 0368 Hunter Disclosure, Plan | 3 hours–Allowed |
| 10–28–81 | Re: Continuance/correspondence | 2 hours–Allowed |
| 11–3–81 | Hunter/Amend Disclosure & Plan, objection claims | 2 hours–Allowed |
| 11–4–81 | Conference with client | 2 hours–Allowed |
| 11–5–81 | Prays – Fact – Law – Fry | 3 hours–Allowed |
| 11–9–81 | Objections to claims | 3 hours–Allowed |

| | | |
|---|---|---|
| 11–12–81 | Prepared Pretrial Order | 4 hours – Allowed |
| 11–16–81 | Conference Hearing | 6 hours – Allowed |
| 11–17–81 | Amended Disclosure, Plan | 5 hours – Allowed |
| 11–19–81 | Subpoenas, 205 Exam denied | 1 hour – Allowed |
| 11–20–81 | Object disclosure statement of Fry, Hunter Disclosure | 3 hours – Allowed |
| 11–21–81 | Correspondence, conferences | 1 hour – Allowed |
| 11–23–81 | Hearing conference with client | 4 hours – Allowed |
| 11–30–81 | Order/circulate plans | 2 hours – Allowed |
| 12–4–81 | Plan, disclosure | 2 hours – Allowed |
| 12–15–81 | Amendments Plan/Counsel conference | 2 hours – Allowed |
| 12–21–81 | Conference-Correspondence re; settlement | 4 hours – Allowed |
| 12–31–81 | Reject Plan, witness, accept Hunter | 3 hours – Allowed |
| **1982** | | |
| 1–6–82 | Hearing, conference with client, Georgetown Plan, Objection | 5 hours – Allowed |
| 1–14–82 | Conference with client and witnesses | 3 hours – Allowed |
| 1–25–82 | Order confirming plan | 1 hour – Allowed |
| 1–26–82 | Conference with client | 4 hours – Allowed |
| 1–27–82 | Notice of Hearing | 1 hour – Allowed |
| 2–17–82 | Motion to reconsider | 2 hours – DENIED |
| 2–18–82 | Hearing | 2 hours – DENIED |
| 2–20–82 | Conference re; claim of Imperial, etc. | 3 hours – DENIED |
| 3–1–82 | Conference re; claim of Imperial, etc., | 1 hour – DENIED |
| | TOTAL HOURS | 221 hours |

Those items marked "Denied" do not reflect upon the value of the services rendered but signify time spend on services which should not be paid from the estate.

Based upon the facts and a weighing of all factors, including the actual necessary services rendered for the Debtor and Debtor in Possession, the time expended, the nature and extent of the services, the *quantum meruit* value of the estate, and the cost of comparable services in the Chapter 11 area, a reasonable fee to be paid from the estate on the Baggott fee request must be allowed.

## II

Having delineated the discretionary nature of the court function in allowance of the requested attorneys' fees, the more difficult problem is the determination of the proper and reasonable monetary amount to be paid by the estate (and, conversely, the portion to be paid by the Debtor partners and intertwined individuals and closely held corporations).

The portion payable to the attorneys, as representing the Debtor, is clearly enunciated in *Cle-ware Industries,* at page 883, as follows:

We reemphasize that the attorneys for the debtor can be compensated only for those services normally performed by an attorney serving in that capacity. These include the following; the preparation and filing of the schedules and statement of affairs, the petition for arrangement and all other applications and orders which were required except those relating to the operation of the business; appearances on behalf of the debtor in court proceedings; attendance at meetings of creditors to consider the proposed arrangement; preparation of the application and order for confirmation and attendance at hearings thereon, offering of the required proof of the "feasibility" of the arrangement and that it was in the best interest of creditors; and representation of the debtor in other hearings involving the adoption of the arrangement. [citation omitted].

To this traditional narrative of guidelines must be added the services rendered, including time consumed in court appearances, in the preparation and prosecution of the Plans of Reorganization, and associated services, such as opposing the attempts by Hunter, as mortgagee, to liquidate the estate assets in foreclosure which would have resulted in the defeat of the interests of all other parties.

The guidelines of this Court in *Matter of Brethren's Home,* 24 B.R. 336 (Bkrtcy.Ohio, 1982) and *Matter of The Liberal Market, Inc.,* 24 B.R. 653, 9 B.C.D. 1216 (Bkrtcy. Ohio, 1982) are incorporated by reference, for the sake of avoiding further extensive elaboration herein. Conformably to the findings in those cases, the hourly rate for attorneys in the Chapter 11 area should range between $65.00 per hour to $100.00 per hour. The Baggotts have testified that their standard hourly rate is billed at $100.00 per hour. In light of the unusual complexities of the litigation in this case, we find that this hourly rate falls in part within the previous parameters for the Chapter 11 area, particularly in light of the complex adversarial proceedings from which the confirmed Plan of Reorganization stemmed in major part.

Much of the litigation herein, as in any bankruptcy or reorganization case, involved complex litigation among multiple parties and concerning both state and federal law issues, such as the long and involved foreclosure suit. This type litigation would dictate a fee at the higher end of the fee range. Other services involved matters of lesser importance, including estate administration problems, as the litigation as to which of the partners of the Debtor would be best qualified to manage the business to obtain the maximum economic benefits for all interested parties, especially the interests of the first mortgagee holder (Hunter) vis-á-vis the various classes of unsecured creditors. Such services fall within the lower range of allowable fees. The preparation analysis, and prosecution of the various Plans of Reorganization, which lead to confirmation of Hunter's Plan, required a high level of financial expertise, involving millions of dollars and the highest level of responsibility, and of considerable merit to both the court and the interested parties in resisting the first mortgagee take over (Hunter) to the detriment of all other classes. Based upon consideration of all of these factors, a reasonable fee will be averaged at $65.00 per hour to the extent benefitting the estate. This figure includes a 15% discount for services also indirectly benefitting the interrelated entities to reflect the portion of legal services to be paid by them, which should not be paid exclusively by the Chapter 11 estate.

This allocation thus excludes compensation for incidental services for which Frederic E. Gagel, individually; Imperial Management, Inc.; G.W.F. Investment, Ltd.; and Acme Precision Building, Ltd. should bear a proportionate share of the legal expense, even though in all major respects their respective interests were the same as those of the Debtor, the Debtor in Possession and the creditors other than Hunter.

The fee allowance is based partly upon the *quantum meruit* rationale as to benefits only to the Debtor (including the Debtor in Possession) and to the estate and interested parties and partly upon the hourly rates for time consumed, as adjusted herein.

Even though the *quantum meruit* factor is given primary consideration and weight because of the objections of Hunter, the basic approach in the final determination is based upon what has been dubbed the "lodestar" approach. On the other hand sufficient hours were rendered which benefitted the estate to justify the allowance as determined. See *In Re Casco Bay Lines, Inc.* (1st Cir.1982) 25 B.R. 747, 9 B.C.D. 1301; and Bkr-L Ed. Summary § 2:83.1 Quoting from *Casco,* 25 B.R. 747, 9 B.C.D. at page 1308, we emphasize that "... The reorganization process is at best the reconciliation of conflicting views and rights as reflected in a financial readjustment. Those conflicting views are entitled to able and partisan representation. The benefit analysis employed by the bankruptcy court cannot be so strongly construed as to stifle the voices of those participating in the reorganization proceeding. Of course, it is the

bankruptcy court's prerogative to strike those services which exceeded the bounds of reasonable efficiency and productivity. The total disallowance of these hours, however, constitutes an abuse of discretion."

Addressing the specifics of the fee allowance request *sub judice* and referring to the copy of "Exhibit A" therefrom incorporated verbatim by reference, the elements which contributed to the successful Plan of Reorganization are marginally marked "Allowed" or "Denied."

In summary, this Court does not find in the record any reprehensible conduct or conflicts of interest as to justify the denial of all fees for professional services rendered. Such punitive measures should not be exercised by a court merely to rectify administrative provisions of the statutes and applicable rules enacted and adopted to implement court discretion. Such an arbitrary stance would constitute merely an abdication of a very complex judicial function.

The proper and justifiable total fee allowance for legal services benefitting the Chapter 11 estate is fixed in the amount of $13,965.00.