In re GHR ENERGY CORP., f/k/a Good Hope Refineries, Inc.,

GHR Pipeline Corp., f/k/a Southern Pipe Line Corp.,

Southern States, Inc.,

Southern States Exploration, Inc.,

Laredo Exploration, Inc.,

Southern Petroleum Trading Company, Ltd.,

and

GHR Transmission Corp., f/k/a Southern Gas Transmission Company, Debtors.

Bankruptcy Nos. 84–03474–H1–5 to 84–03480–H1–5.

United States Bankruptcy Court, S.D. Texas, Houston Division.

July 20, 1985.

Joe G. Roady, Jane Pearson Hirst, John P. Melko, Kyung S. Lee, Sheinfeld, Maley & Kay, Houston, Tex., Richard C. Tufaro, Charles E. Dropkin, Milbank, Tweed, Hadley & McCloy, New York City, for the Movant.

Max Gitter, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, Stephen D. Susman, John McArthur, Susman, Godfrey & McGowan, Houston, Tex., for respondent.

John C. Nabors, J. Michael Dorman, Liddell, Sapp & Zivley, Houston, Tex., for the debtors.

## MEMORANDUM OPINION AND ORDER

MANUEL D. LEAL, Bankruptcy Judge.

This matter, before the Court on the Bank Group's motion to disqualify McCabe/Gordon P.C. as attorney for the debtors, raises the issue of whether one of the debtors' law firms must be disqualified from representing these debtors when it hires as an associate an individual who had previously been employed by one of the major secured creditors, and, as part of his official duties played a significant role in the negotiation and consummation of major syndicated loan transactions. The debtors have subsequently challenged these transactions in numerous federal lawsuits. Also presented is whether one of the debtors' law firms must be disqualified when two of its members are officers of the debtor which they represent. Violations of Canons 4, 5 and 9 of the Code of Professional Responsibility and 11 U.S.C. §§ 327(a) and 101(13) of the Bankruptcy Code are alleged by the moving parties. Hearings were held on September 6, 10, 12, 21 and 24 of 1984 and this Court makes the following findings of fact and conclusions of law based on the evidence presented as well as the pleadings and memoranda filed.

GHR Energy Corp. filed a petition under Chapter 11 of the Bankruptcy Code on January 26, 1983. This petition was followed by the Chapter 11 petitions of GHR Pipe-

line Corp., Southern States, Inc., Southern States Exploration, Inc., Southern Petroleum Trading Co., Ltd., which were filed in February, 1983. The Chapter 11 petition of GHR Transmission Corp. was filed on January 18, 1984. The bankruptcy cases involving these debtors (hereinafter collectively referred to as "GHR") are jointly administered pursuant to three court orders entered by the Honorable Paul W. Glennon on February 18, March 23 and June 13, 1983. The petitions were originally filed in the bankruptcy court in Worcester, Massachusetts, and were administered there until June 22, 1984. At that time, the cases were transferred to the bankruptcy court in the Southern District of Texas.

GHR is in the business of exploration, production and marketing of natural gas. Approximately 350,000 acres in Webb and Zapata counties in south Texas are held by GHR under hydrocarbon leases. GHR Transmission Corp. and GHR Pipeline Corp. own and operate pipeline gathering and transmission facilities in south Texas. GHR also operated a crude oil refinery in Good Hope, Louisiana until January 26, 1983.

Jack Stanley is the sole shareholder of GHR's outstanding stock. Stanley was involved in a prior bankruptcy case which was filed on October 31, 1975 on behalf of GHR Companies and three of its subsidiaries. While in chapter XI, GHR Cos. and its subsidiaries operated as a debtor-in-possession. A plan of arrangement was confirmed in May, 1980 which called for a 100% payout to all creditors. GHR Cos. defaulted under the terms of its plan and on January 19, 1984, was adjudicated a bankrupt by the bankruptcy court and the case was ordered to be administered under the 1898 Act, jointly with the current bankruptcy cases filed in 1983.

Among the approximately twenty law firms which GHR currently employs, four law firms handle a majority of the bankruptcy litigation matters. These are McCabe/Gordon P.C., which consists of sixteen lawyers; Liddell, Sapp, Zivley and La-Boon, which consists of eighty lawyers; Cadwalader, Wickersham & Taft, which consists of 164 lawyers and Adams and Reese which consists of 60 lawyers.

## THE BANK GROUP

The Bank Group which consists of Banque Paribas, Continental Illinois National Bank and Trust Company of Chicago, the Chase Manhattan Bank, N.A., National Bank of Detroit, Seattle-First National Bank, NCNB National Bank of North Carolina, European American Bank & Trust Company, Bank Arabe Et Internationale D'Investissement, Mercantile National Bank of Dallas, First National Bank and Trust Company of Oklahoma City, Fleet National Bank, American Security Bank, N.A., Canadian Commercial Bank and Capital Bank N.A. (hereinafter the "Bank Group" or the "Banks") filed their motion for disqualification of the law firm of McCabe/Gordon, P.C., on May 9, 1984.

The Bank Group members are all participants in the Amendment and Restatement of Secured Revolving Credit Agreement (hereinafter "Credit Agreement") dated December 23, 1981. Under the Credit Agreement, Banque Paribas (hereinafter "Paribas") is the letter of credit agent for all of the other banks and co-manager with Chase Manhattan Bank and Continental Illinois Bank. The Credit Agreement was structured so that Paribas was authorized to act on behalf of the other banks on certain administrative matters. The Banks agreed to and lent 750 million dollars to GHR with Paribas contributing 245 million dollars or 32.675 percent of the loan. To secure the loan which was extended under the Credit Agreement, GHR and its affiliates granted the Banks' liens on virtually all of GHR's assets, including the refinery, oil and gas properties and the proceeds therefrom, pipeline facilities, inventory and account receivables. On October 1, 1982, the Bank Group entered into a restructuring agreement with GHR (hereinafter the "Bellarmine Transaction"), the terms of which were that the Bank Group would release their liens on certain oil and gas

properties in return for GHR conveying two production payments in the amounts of 375 million dollars and 52 million dollars to the Bellarmine Foundation, Inc., with the Bank Group taking a mortgage in the payments conveyed. As part of this restructuring arrangement, Occidental Crude Sales, Inc., loaned GHR forty million dollars to purchase crude and other materials for GHR's refinery operations and the Bank Group agreed to subordinate their security interests and collateral by a like amount. After the restructuring, the amount owed to the Bank Group was reduced to 375 million dollars; in addition, the Bank Group held mortgages in two separate production payments totalling 427 million dollars. Paribas alleges that it is owed 122.5 million dollars on the loans and 138.8 million dollars on the mortgage payments.

## CHRISTIE'S ASSOCIATION WITH PARIBAS AND HIS ROLE IN THE CREDIT AND RESTRUCTURING AGREEMENTS

Donald J. Christie, was hired by Banque Paribas in July or August, 1979, as an assistant vice president to work in its corporate lending division. At the time of his hiring, Christie informed Paribas that he was attending law school at night. Paribas paid Christie's bar review fees as well as his last semester's tuition at law school.

Christie's initial contact with GHR was in November, 1979. Christie was the principal account officer on GHR for Banque Paribas from that date until September 1982. Although Christie did not have the power to make a final determination on the actual extension of credit, his responsibilities as principal account officer consisted of analyzing GHR's assets, income and debts and making recommendations to the management at Paribas on the extension of credit to GHR. After the extension of credit, Christie's responsibilities were to acquire, maintain and study information about GHR to be used by his superiors at Paribas in making final determinations as to the granting of credit to GHR. As part of his official duties, Christie attended and participated in numerous meetings with representatives of other banks and their attorneys, as well as GHR representatives. During some of these meetings, only the Bank Group's representatives and their counsel were present and legal advice was sought and given with respect to the Bank Group's relationship with GHR.

Prior to the signing of the Credit Agreement, Christie played a significant role in arranging Paribas' initial 20 million dollar credit facility to GHR in February, 1980. In November, 1980, Paribas' credit facility to GHR was increased to 100 million dollars. The credit memorandum was prepared by Christie and contained his recommendation which supported the increase. In April, 1981, Paribas extended the credit to 150 million dollars based on the recommendation and analysis which was prepared by Christie. In December, 1981, when Paribas became a participant in the syndicated Credit Agreement, its share of the facility was increased to 245 million dollars based on Christie's report and recommendation. Paribas was represented by New York counsel who had conversations with Christie in which legal advice was sought and given. When the restructuring agreement was executed, it was done on the basis of Christie's recommendation and analysis. Mr. Christie stated to the vice president of Paribas that "he [Christie] had some major responsibility for that [Bellarmine] transaction having taken place." Christie was an active participant, if not the lead participant in the Occidental Transaction, described above, which was part of the Bellarmine Transaction.

Christie was the loan officer who managed the GHR account for Paribas while the major transactions with GHR occurred. Christie had more knowledge of these transactions than anyone at Paribas. The files pertaining to the financial relationship with GHR were kept in Christie's office. At all times, Christie had access to confidential information contained in Paribas files, including privileged documents

from various counsel regarding the GHR account.

Christie sat for the New York State Bar Examination in July of 1982. After being notified in December, 1982 of having passed the bar examination, Christie was transferred to the office of Paribas' legal counsel. This transfer was due to problems with the GHR account, specifically a short fall in the debtor's collateral which secured Paribas' credit facility and an opinion by superiors at Paribas that Christie had lost his objectivity in dealing with GHR and the account as a whole. Christie admitted, if called to testify he would give testimony adverse to GHR in relation to the hundred million dollar short fall (Tr. 521–23).

While in the legal department at Paribas, Christie had access to confidential documents which contained advice from attorneys to Paribas on GHR. Christie was also responsible for giving background information on the account to assist his replacement as account officer, William Steven Hammell, in taking over the account. Due to the fact that GHR's counsel, Steve Gordon, threatened bankruptcy if the Bank Group did not cooperate on a certain deal, Mr. Hammell sought advice on legal issues from Christie. Mr. Hammell sought advice from Mr. Christie as to whether GHR had violated the law when the Bank Group was notified of a 100 million dollar short fall in the borrowing base certificates. Other issues on which Christie gave advice included: basic bankruptcy issues, preferences, the Bellarmine Transactions, venue, and the consequences of a company going into bankruptcy for the second time (Tr. 44). Christie was cooperative in giving answers to these legal questions. In these conversations, Hammell communicated confidential information concerning the Bank Group to Christie.

In the spring of 1982, the New York law firm of Millbank, Tweed, Hadley & McCloy, was retained to represent Paribas as well as its former client, Chase Manhattan Bank. Harold F. Moore, was the attorney assigned to the Paribas account. Moore had several meetings with Christie not only when Christie was an account officer but also while Christie was on the legal staff. During these meetings, Moore gave legal advice on the Bellarmine Transaction. All the legal advice that Moore gave was understood by him to be confidential. Ralph Aiello, Christie's superior in the legal department, gave Christie two confidential memoranda to read which related to loan transactions between Paribas and GHR, asking Christie to review them.

By letter dated March 2, 1983, Christie gave notice to Elie Sauof, executive vice president and general manager of Paribas, of his resignation from Paribas. On March 4, 1983, Christie terminated his employment with Paribas. This was an emotional departure for Christie felt Paribas had mistreated him (Tr. 459–60). On March 7, 1983, he was employed by the New York law firm of Weil, Gotshal & Manges. On April 11, 1983, Christie was admitted to practice as an attorney in the state of New York.

## McCABE/GORDON'S RELATIONSHIP WITH THE DEBTORS AND THE HIRING OF DONALD J. CHRISTIE

Stanley was involved in a prior bankruptcy under the 1898 Act. It was at that time that Steve Gordon began his representation of the debtor. Gordon is admitted to practice in the state of Massachusetts. Gordon became associated with GHR when he was a senior associate at the law firm of Widdett and Widdett in Boston, Mass. The firm was appointed co-counsel and lead bankruptcy counsel for the GHR Cos. in their prior bankruptcy proceedings. In 1976, Gordon became the principal attorney in charge of the Chapter XI proceedings. Gordon's representation continued after the reorganization plans were confirmed; his duties included post-confirmation administrative duties, litigation of proof of claims, non-bankruptcy litigation, mergers and acquisitions, contracts for sale and transmission of natural gas, financing agreements, antitrust problems and maritime matters. Between 1979 and the filing

of the current Chapter 11 petitions in 1983, Gordon represented GHR in all aspects of the negotiation of credit agreements with the Bank Group. After the current petitions were filed in 1983, Gordon, while still a member of the Widdett firm, was appointed general counsel to GHR by the court in January, 1983. Two months later, on March 10, 1983, the firm of McCabe/Gordon was formed. McCabe/Gordon occupies one floor in an office building and all associates have access to data kept in document form or on computer disc. The retention of GHR as a client was a significant factor in the decision to form the partnership of McCabe/Gordon. At the time of the formation of McCabe/Gordon, and to this day, GHR accounts for approximately 75 percent of the income of McCabe/Gordon. McCabe/Gordon coordinates the work of GHR's other outside counsel and advises GHR about matters relating to litigation strategy, planning and tactics.

While at the Widdett firm, both Gordon and Richard Wise, an associate who followed Gordon to McCabe/Gordon were officers in GHR, Cos. Inc. Wise was assistant clerk in July 1980 and continues to occupy such corporate office today. Wise was also appointed assistant secretary of GHR Cos. and continues to occupy such corporate office today. Gordon was appointed assistant secretary of GHR, Inc. on May 20, 1980 and is also assistant clerk to GHR Cos. Gordon holds both these corporate offices to this date (Tr. 135–36). The sole purpose of these appointments was to facilitate the signing of documents relating to the loan agreements with the Bank Group. The sole function performed by Gordon and Wise in such capacities was purely ministerial: to attest to signatures and authority of Good Hope officers on the loan agreements. Their appointment to such positions was made in consultation with counsel for the Bank Group and was prompted by the Bank Group's insistence that the agreements be executed in Chicago, Illinois rather than at GHR's offices in Louisiana and Texas. When McCabe/Gordon was appointed general counsel, our

records indicate that there was no disclosure of the above fact in their application to be employed under § 327. In addition, no evidence was presented as to why Gordon and Wise continue to hold these corporate positions to this date.

At the time McCabe/Gordon was established, there were only two associates working with the two name partners. Gordon was actively recruiting candidates for associate positions. Gordon gave Christie a call at Weil, Gotshal & Manges, a week after Christie went to work there. Gordon had first met Christie in 1979 when Christie was an account officer at Paribas. They met at the University Club in New York City on March or April, 1983. It was at this meeting that Gordon first told Christie that Christie could be working on GHR. Gordon admitted that the reason for recruiting Christie was that, *inter alia*, "he had knowledge about GHR and he was liked by my best client." Gordon and Christie discussed three possible ways whereby Christie would operate at McCabe/Gordon: 1) Christie could work on all GHR matters; 2) Christie could work on no GHR matters; 3) Christie could work on only those GHR matters not adverse to his former employer which were unrelated to the work he performed at Paribas. It was agreed that if an offer was extended and accepted, Christie's work would be limited to those matters not adverse to the Bank Group in terms of Christie's former employer. Gordon presented the firm in a favorable light and made a job offer to Christie on May 4, 1983 which was immediately accepted. Christie resigned from Weil, Gotshal, & Manges in May, 1983. During this time, no member of McCabe/Gordon sought the approval of Paribas as to Christie's employment. Christie commenced work at McCabe/Gordon on June 6, 1983, and worked on the GHR case until September 20, 1983, when he was officially screened from the case.

Aiello learned of Christie's interest in the McCabe/Gordon firm in early April, 1983 when he told Christie he thought that Gordon represented his clients well. At a later

date, Aiello notified Paribas' outside counsel, Phillip Werner of Wendes, Murase, & White who contacted Christie and told him that his move to McCabe/Gordon showed "poor judgment" and "might cause problems at the beginning of Christie's career." In mid-May 1983, Christie had separate conversations with Hammell and John Jerome of the Millbank, Tweed firm. At this time, Jerome requested a letter from McCabe/Gordon to Paribas which stated that Christie would not be working on any GHR matters. Gordon objected to furnishing the letter to Paribas earlier because "we had specifically hired Don to help with GHR case administration and felt he could be valuable and felt there was no reason to keep that value from the client because there was no conflict with his prior employment" (Tr. 175). In addition, the Bank Group directed Aiello to object to Christie's decision to accept the associate position at McCabe/Gordon. This letter was received by Christie on June 1, 1983 before he started to work at McCabe/Gordon and Gordon was aware of the objection prior to Christie commencing employment at the firm.

As of June 6, 1983, Christie began working on GHR administrative matters. He assisted in the noticing of parties as to scheduled hearings, drafting of pleadings in regard to the hiring of professionals, appearing in court on behalf of his client and took part in conferences with other attorneys for the debtors, most notably, the Cadwalader law firm. On June 9, 1983, upon Christie's appearance at a scheduled hearing before the United States Bankruptcy Court in Worcester, Massachusetts, counsel for the Bank Group stated his objection to Christie's appearance on the record. Acting Assistant United States Trustee Gerrand F. Kelley wrote to Gordon on June 10, 1983 in regard to the implications of Christie's employment under § 327 of the Bankruptcy Code. Gordon responded to Kelley's letter in two instances. On June 14, 1983, Gordon claimed that Christie's employment was consistent with the Bankruptcy Code. Subsequently, on September 2, 1983, Gordon claimed that the Bank Group had waived any objection to Christie's employment due to the Bank Group's failure to act promptly.

By letter dated June 29, 1983, Harold S. Novikoff of Wachtell, Lipton, Rosen & Katz, bankruptcy counsel for movants informed Gordon in detail of the movant's objection to Christie's employment with McCabe/Gordon. On September 6, 1983, the Bank Group and the law firm of Cadwalader, Wickersham & Taft executed a stipulated protective order whereby documents produced by the Bank Group may be disclosed only to Cadwalader or to an expert it may retain and may not be disclosed to Christie or to anyone at McCabe/Gordon. By motion dated September 9, 1983, the Bank Group, pursuant to the aforementioned stipulation, requested a protective order prohibiting Cadwalader from disclosing to McCabe/Gordon any document discovered pursuant to the stipulation. This motion was never acted upon. The Bank Group filed an objection to the Application of McCabe/Gordon, P.C. for Interim Allowance for June and July, 1983 on September 9, 1983. This application reflects the first period for which Christie did any work for McCabe/Gordon on behalf of GHR.

On September 21, 1983, McCabe/Gordon notified the United States Bankruptcy Court and all interested parties of the withdrawal of Christie from all involvement as to GHR matters. This was the first date that Christie was screened from the GHR case. The time records of McCabe/Gordon, submitted in accordance with their respective fee applications for the period of September, 1983 through the date of this hearing, reflect such withdrawal. In an effort to negotiate a consensual plan of reorganization, the parties to this motion entered into two agreements. On October 21, 1983, the parties executed a "Tolling Agreement." Under this agreement, the objections of the Bank Group to McCabe/Gordon's employment of Christie were expressly preserved prior to the filing of their motion to disqualify. The Tolling Agreement precludes and estops GHR and, by representation, McCabe/Gordon, from

asserting "laches, undue delay, waiver or otherwise" as a defense against this motion for any period from October 21, 1983 until the making of the motion. On October 27, 1983, the parties entered into a stipulated protective order whereby the Bank Group withdrew its objections to the McCabe/Gordon fee applications upon the stipulation that such withdrawal did not constitute a waiver of their objection or rights. Also, no delay or failure on the part of the Bank Group asserting or exercising their rights or remedies as to disqualification or objection to fees of McCabe/Gordon, P.C. was to be constituted as a waiver of any such rights or remedies so long as the standstill agreement was in full force and effect.

## GHR'S LAWSUITS WITH THE BANK GROUP

At the time Christie was hired by McCabe/Gordon the debtor was involved in drafting various complaints which challenge the propriety of the Banks actions when it induced the debtor to enter into the credit agreements. These complaints all involve the financial transactions which Christie was responsible for while he was principal loan officer for Paribas. The antitrust complaint, filed by GHR on December 13, 1983 in the United States District Court for the Southern District of New York, was in its formative stages when Christie was hired. The complaint names Paribas, Continental Illinois and Chase Manhattan Banks and seeks treble damages under Section 1 of the Sherman Act (15 U.S.C. § 1), and § 106(b) of the Bank Holding Co. Amendments of 1970 (12 U.S.C. § 1972(1)), one billion dollars in damages for alleged economic duress, one billion dollars in damages for alleged breaches of duty and 200 million dollars in damages for alleged wrongful interference with business relations. GHR alleges that the credit facility set up by Paribas, the syndicated credit agreement, as well as the restructuring of the credit agreement (the Bellarmine transaction) were the result of a conspiracy to restrain, restrict or otherwise limit the availability of credit from commercial banks to GHR. More specifically, the conspiracy entered into by the Banks was done to facilitate an exclusive arrangement between GHR and Continental and Paribas which was then exploited by the Banks to their advantage. The transactions which GHR assails were all handled by Christie while he was the principal account officer at Paribas.

The prime rate complaint was filed in the United States District Court for the Eastern District of Louisiana on May 31, 1984 naming Continental and Paribas. This complaint alleges violations of the National Bank Act (12 U.S.C. § 85, 86) and the RICO statutes. This complaint challenges the loan transactions entered into by the Banks, stating that the Banks charged a rate in excess of the rate of interest agreed to by those parties. This complaint alleges that the Banks committed fraud in extracting the interest rate. Once again, the allegations are based on the loans which Christie was instrumental in consummating while at Paribas.

In their equitable subordination lawsuit filed on December 9, 1983, GHR attempts to void all payments made from production pursuant to the Bellarmine transaction pursuant to 11 U.S.C. § 550(a) and (b) and subordinate all of the Banks claims to the claims of GHR's other creditors. This is the restructuring transaction that Christie played a major role in while an account officer at Paribas.

GHR filed a turnover complaint on December 21, 1983, seeking to compel the Banks to turnover all cash collateral and production payments pursuant to the Bellarmine Transaction so that GHR can construct a coker at GHR's refinery. GHR relies on the Bellarmine transaction in this complaint as the basis for the turnover of funds. This complaint also raises the issue of Paribas lending practices while Christie was principal account officer.

The above described complaints were either filed by Cadwalader, Wickersham and Taft or Adams & Reese with McCabe/Gordon listed as being of counsel. Despite the fact that Cadwalader is described as GHR's

"trial" counsel, McCabe/Gordon was lead trial counsel for a segment of the turnover action relating to the coker tried in Boston (Tr. 278). In addition, Christie admitted Stanley told him his deposition might have to be taken, (Tr. 447), as well as the Bank Group noticed Christie for a deposition. (Tr. 519).

## CONCLUSIONS OF LAW

### JURISDICTION

■ This action presents two separate and distinct issues. First the Bank Group argues that Christie and the McCabe/Gordon firm must be disqualified pursuant to the Canons of the Code of Professional Responsibility. Second, the Bank Group seeks to disqualify the McCabe/Gordon firm for it is allegedly interested in the case and therefore cannot be employed by the debtor pursuant to 11 U.S.C. § 327(a).

The second issue is clearly a core matter. Pursuant to 28 U.S.C. § 157(b)(2)(A) core proceedings include "matters concerning the administration of the estate." The right of the debtor to employ an attorney was granted by Congress in 11 U.S.C. § 327(a) subject to certain conditions. Congress has left no doubt as to what matters concern case administration for it subtitled Chapter 3 of title 11 "Case Administration." Since the right to employ and compensate an attorney is within this section, the issue of whether a firm is "disinterested" under § 327(a) and defined in § 101(13) is a core proceeding.

The first issue as to Christie's and McCabe/Gordon's disqualification relates to the administration of the debtor's estate as well. Congress has stated in § 327(a) that "the trustee can employ, with the court's approval, one or more attorneys that do not hold or represent an adverse interest to the estate..." 11 U.S.C. § 327(a) (1984). In deciding whether the McCabe/Gordon firm, by hiring Christie, holds an interest adverse to the estate, the Court has looked for guidance to the Code of Professional Responsibility. The Fifth Circuit has stated that the Ethics Code

governs the conduct of lawyers practicing before federal courts, and is a guideline for the federal courts to follow in the regulation of their affairs. *Woods v. Covington City Bank*, 537 F.2d 804, 810 (5th Cir. 1976). Bankruptcy courts have consistently held that a violation of the Code of Professional Responsibility in and of itself justifies a final order from the court disqualifying counsel, *In re Guy Apple Masonry Contractor*, 45 B.R. 160, 168 (Bankr. D.Az.1984); *In re B.E.T. Genetics, Inc.*, 35 B.R. 269, 271 (Bankr.E.D.Cal.1983); *In re Chou-Chen Chemicals, Inc.*, 31 B.R. 842, 850–51 (Bankr.W.D.Ky.1983), as well as district courts, *In re Philadelphia Athletic Club, Inc.*, 20 B.R. 328, 335 n. 6 (Bankr.E. D.Pa.1982); *In re Paine*, 14 B.R. 272 (Bankr.W.D.Mich.1981). Therefore, pursuant to its administrative powers, the Court will consider the aspect of this case dealing with Christie's involvement a core matter.

## I.

### CANON 4

Canon 4 is entitled "A lawyer should preserve the confidences and secrets of a client." The relevant disciplinary rule states:

(B) Except when permitted under DR 4–101(C), a lawyer shall not knowingly:

(1) Reveal a confidence or secret of his client.

(2) Use a confidence or secret of his client to the disadvantage of the client.

(3) Use a confidence or secret of his client for the advantage of himself or of a third person, unless the client consents after full disclosure.

The rule requires the court to disqualify an attorney from opposing his former client if the court determines that the sanctity of information previously given in confidence is in jeopardy. *Duncan v. Merrill Lynch, Pierce, Fenner and Smith*, 646 F.2d 1020, 1027 (5th Cir.), *cert. denied*, 454 U.S. 895, 102 S.Ct. 394, 70 L.Ed.2d 211 (1981). The justification for this rule is threefold. First, it would be grossly unfair to permit an attorney to reveal confidences of his

former client to the client's adversary. *Id.* Second, a client would not freely disclose confidential information to his attorney if the public perceived that this confidential information would be disclosed by the attorney, and third, the integrity of the judicial system would be undermined if a lawyer could hypocritically profess undivided loyalty to his client while divulging information gained in confidential communications. *Id.*

■ It is well settled law that in order to establish a violation of Canon 4, there must have been an actual attorney-client relationship between the party seeking disqualification and the attorney, and that the matters involved in the present litigation be substantially related to the matters involved in the former representation. *In re Corrugated Container Antitrust Litigation,* 659 F.2d 1341, 1345 (5th Cir.1981) *Cossette v. Country Style Donuts, Inc.,* 647 F.2d 526, 530 (5th Cir.1981); *Duncan v. Merrill Lynch, Pierce, Fenner & Smith,* 646 F.2d 1020, 1028 (5th Cir.), *cert. denied,* 454 U.S. 895, 102 S.Ct. 394, 70 L.Ed.2d 211 (1981). *Brennan's, Inc. v. Brennan's Restaurants, Inc.,* 590 F.2d 168, 171 (5th Cir. 1979). *Accord Doe v. A Corp.,* 709 F.2d 1043, 1046 (5th Cir.1983). The party seeking disqualification of his former counsel must bear the burden of proving the existence of a prior attorney-client relationship and that the present and prior representations are substantially related. *Duncan v. Merrill Lynch, Pierce Fenner & Smith, supra* at 1028. In the absence of the attorney-client relationship, "the duties of loyalty and confidentiality do not arise." *In re Yarn Processing Patent Validity Litigation,* 530 F.2d 83, 90 (5th Cir.1976); *American Can Co. v. Citrus Feed Co.,* 436 F.2d 1125, 1128–30 (5th Cir.1971).

■ Applying the law to the facts, this Court concludes that disqualification of Christie and McCabe/Gordon is not warranted under Canon 4. Christie became bound by the Ethics Code upon his admission to practice as an attorney in New York on April 11, 1983. Rules of the Appellate Division, First Judicial Department § 603.2.

*See* N.Y.Jud.Law § 90(2) (McK.1983). On April 11, 1983, Christie was employed by the Weil, Gotshal firm. All of the confidential information which Christie has knowledge of was received while he was an account officer with Paribas and not while he was an attorney. Therefore, under existing law, Christie had no duty of loyalty and confidentiality in reference to any information received before he was admitted on April 11, 1983.

## CANON 5

Canon 5 of the Code of Professional Responsibility is entitled "A lawyer should exercise independent professional judgment on behalf of a Client." Specifically DR 5–102(A) provides:

DR 5–102. Withdrawal as Counsel When the Lawyer Becomes a Witness.

If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial and his firm, if any, shall not continue representation in the trial, except that he may continue the representation and he or a lawyer in his firm may testify in the circumstances enumerated in DR 5–101(B)(1) through (4).

If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm may be called as a witness other than on behalf of his client, he may continue the representation until it is apparent that his testimony is or may be prejudicial to his client.

The purpose of this Canon is prophylactic for if the attorney's testimony is adverse to his client, there is a direct conflict between the attorney's duties to his client, and his obligation to testify truthfully under oath. Note, *Developments—Conflicts of Interest,* 94 Harv.L.Rev. 1244, 1289–90 (1981). The Canon requires withdrawal of representation in order to avoid this dilemma for the lawyer.

■ The Fifth Circuit has stated that disqualification is required when counsel "ought" to appear as a witness. *Cosette v. Country Style Donuts, Inc., supra* at 530; *accord Waltzer v. Transidyne General Corp.,* 697 F.2d 130, 134–35 (6th Cir.1983). What controls is whether the attorney ought to testify, not whether he will testify. That the lawyer and the client decide that the lawyer need not testify is not controlling. *Id.* The moving party must show that McCabe/Gordon is aware of facts that would make it obligatory to place Christie on the witness stand in order to advance GHR's case completely and zealously or it is likely that they will be called to the witness stand by the Banks to testify on a matter of importance to the Banks' case. *Cossette v. Country Style Donuts, Inc., supra* at 530–31.

■ The Banks have easily met this burden. On May 4, 1984, GHR filed its list of witnesses in connection with the Bank Group's motion to appoint a trustee. The debtor designated Christie as one of the witnesses whom they "presently intend to call in opposition to the Bank's joint motion for appointment of a trustee." Even though an order was signed allowing the Banks to withdraw their motion to appoint a trustee, this was done expressly without prejudice to the Banks to refile. Therefore, at this point, GHR still intends to call Christie as a witness in the trustee motion.

In addition, the evidence showed that Christie played a significant role in the restructuring agreement (Bellarmine), specifically the Occidental transaction. Therefore he would be a material witness for either side in the Bellarmine suit or equitable subordination litigation. The Fifth Circuit has structured a three part threshold test which must be met before the court can exercise the power of equitable subordination conferred in 11 U.S.C. § 510. The second part to the test is that the claimant must have engaged in some type of inequitable conduct. *In re Mobile Steel,* 563 F.2d 692, 699 (5th Cir.1977). The principal loan officer at Paribas for the very transaction which is being assailed is a material witness on this issue. In the antitrust litigation as well, GHR must show a conspiracy to restrain trade which affects interstate commerce. In that litigation, the principal account officer while the transaction occurred is a material witness who ought to be called to testify. The same reasoning is applicable to the turnover litigation.

A separate consideration which the Court considers crucial is the "potential of unfair discovery and use of it through private consultation rather than through the normal modes of interrogatories, deposition and trial examination." *NCK Org. Ltd. v. Bregman,* 542 F.2d 128, 132 (2d Cir.1976). McCabe/Gordon, by hiring Christie has the potential of gaining information about the Banks outside of the normal scope of discovery. This undermines the adversary process and is a strong factor in requiring disqualification.

■ GHR argues that even if Christie must be disqualified, this does not require disqualification of the McCabe/Gordon firm under Canon 5. Canon 5, McCabe/Gordon alleges, only applies to trial counsel and since GHR has a separate firm actually designated as trial counsel in all litigation with the Banks, there is no Canon 5 violation. On its face, DR 5–102(A) states that the lawyer who ought to testify shall withdraw from the conduct of the trial and *his* firm shall not continue representation in the trial. The case law which GHR cites is distinguishable on its facts. In the case of *Brotherhood Ry. Carmen v. Delpro Co.,* 549 F.Supp. 780 (D.Del.1982) the district court ruled that the motion to disqualify was premature for the parties were close to a stipulation of facts which would obviate the need for the attorney to testify. *Id.* at 788. The case of *MacArthur v. Bank of New York,* 524 F.Supp. 1205 (S.D.N.Y.1981) stated "if an attorney chooses to become intimately involved in the client's business, then he or she must be prepared to step aside if the matters involved result in litigation." *Id.* at 1211. This Court does not have to decide the issue of whether Canon 5 applies

to counsel represented on pleadings as "of counsel" when another counsel is repre- sented as "trial counsel" because there was evidence presented at the hearing that de- spite the listing of McCabe/Gordon as "of counsel" they have acted as trial counsel for GHR. Specifically, the following ad- mission:

> Mr. Roady: The fact is you did partic- ipate as Trial Counsel in the first part of the turnover Complaint related to the Coker; isn't that true?
>
> Gordon answers: Yes, that's true.

(Tr. 278)

The last sentence of DR 5–102(A) states four exceptions to the general rule of dis- qualification when an attorney ought to be a witness. These are enumerated in DR 5–101(B); the relevant section for the present inquiry is 5–101(B)(4) which states:

> (B) A lawyer shall not accept employ- ment in contemplated or pending litiga- tion if he knows or it is obvious that he or a lawyer in his firm ought to be called as a witness, except that he may under- take the employment and he or a lawyer in his firm may testify: ...
>
>> (4) As to any matter, if refusal would work a substantial hardship on the client because of the distinctive value of the lawyer or his firm as counsel in the particular case.

■ The burden of establishing sub- stantial hardship is upon the testifying at- torney. *U.S. v. Blackhawk Heating & Plumbing Co.*, 423 F.Supp. 486, 490 (S.D. N.Y.1976) In the *Blackhawk Heating* case cited above, the district court rejected the law firm's argument that a 10 year history of representation by this particular law firm and approximately 450 hours of time expended in this case constituted a sub- stantial hardship. *Id.* at 490. This is the same argument made by McCabe/Gordon which must be rejected for McCabe/Gordon has not sustained its burden of showing its particular value to GHR on the issues raised in the litigation with the Banks. For this reason, the Court does not find that disqualification of Christie and McCabe/Gordon would work a substantial hardship on GHR.

## CANON 9

■ Canon 9 is entitled "A lawyer should avoid even the appearance of impro- priety." To determine whether a lawyer has avoided "even the appearance of pro- fessional impropriety" the Fifth Circuit re- quires that the movant show there is a reasonable possibility of the occurrance of "specifically identifiable appearance of im- proper conduct," and that the "likelihood of public suspicion or obloquy outweighs the social interest in obtaining counsel of one's choice." *In re Corrugated Container An- titrust Litigation*, 659 F.2d 1341, 1345 (5th Cir.1981); *Duncan v. Merrill Lynch, Pierce, Fenner & Smith, supra* at 1032; *Brennan's, Inc. v. Brennan's Restau- rants, Inc., supra* at 172; *Woods v. Cov- ington County Bank*, 537 F.2d 804, 812–13 (5th Cir.1976). Violations of other Canons may implicate Canon 9. *In re Corrugated Container Antitrust Litigation, supra* at 1345.

The Banks have showed that the first part of Canon 9 has been met. The specifi- cally identifiable impropriety that has oc- curred or will occur is the breach of Canon 5, discussed above. To reiterate, Christie was hired by Gordon with knowledge that Christie was the principal loan officer for Paribas at a time when complaints were being drafted assailing these very same transactions. Christie worked on the GHR account at McCabe/Gordon while these complaints were being drafted. This Court cannot say with certainty when GHR's counsel decided that Christie should be a witness in litigation against the Bank Group. At that time, the McCabe/Gordon firm was required to withdraw under Can- on 5 which they have not done to this date.

In addition, Christie was in a position of trust and confidence at Paribas. He later began employment with a law firm in- volved in litigation which concerns the very same subject matter. The Court concludes that the fact that Christie might violate

such confidences is sufficient to create the appearance of impropriety.

We must also determine whether the likelihood of public suspicion outweighs the social interest in McCabe/Gordon's continued representation of GHR. GHR asks the Court to weigh the harm to its reorganization in this analysis. The Fifth Circuit has ruled out this factor when it stated:

Canon 9 . . . does not contemplate comparing the relative harm to the former and present clients. This part of Canon 9's test is designated to weigh social interests against each other.

*In re Corrugated Container Litigation, supra* at 1348.

The social interests which the Court must balance are, on the one hand, the probability that a breach of ethics will actually occur, the devaluation of the attorney-client relationship as its particular intrinsic values are undermined by making the client choose between having his attorney as a witness or an advocate, the deterrent effect disqualification may have on future violations by attorneys, and, most importantly, the integrity of the judicial process. Note, *Developments Conflicts of Interest, supra* at 1473. The factors which mitigate against disqualification, in addition to the delay, inconvenience and expense of retaining new counsel are the right of the litigant to freely choose competent counsel, the related interest in allowing the party to proceed through its own counsel in a speedy resolution of their lawsuit and the right of the attorney to freely practice his profession. *Woods v. Covington City Bank, supra* at 812.

The Court concludes "after painstaking analysis of the facts and precise application of precedent" *Brennan's v. Brennan's Restaurant, Inc., supra* at 173–74, that disqualification is warranted in this case when it balances the above factors. If Christie and the McCabe/Gordon firm continue to assist and act as trial counsel in the lawsuits which challenge the transactions in which Christie played a significant role, this participation would "taint" the entire trial. *See Board of Education v.*

*Nyquist,* 590 F.2d 1241, 1246 (2d Cir.1979). The reason for this is that a trial exemplifies "procedural justice." Note, *Developments—Conflicts of Interest, supra* at 1475. The legitimacy of the result in large part inheres in the process by which that result is achieved. *Id.* Any result obtained in the litigation against the Banks in which the McCabe/Gordon firm actively participated after hiring Christie would impugn the legitimacy of the trial. This factor outweighs the factors which disfavor disqualification. The delay, inconvenience and expense factors are inapplicable to this case by virtue of the fact that GHR has several other major law firms actively involved in the daily administration of the bankruptcy case. GHR has freely chosen various counsel; however, this Court cannot sanction the actions of a law firm when it pursues and hires a potential material witness who had previously been employed by an adversary. To deter this behavior, and to uphold the integrity of the judicial process, McCabe/Gordon and Christie must be disqualified.

■■■ GHR has two defenses which it asserts to the Banks' motion to disqualify. One is that the Banks consented to Christie's employment and therefore have waived their objection, and, second, that the Banks' motion is barred by laches due to their delay in filing the disqualification motion.

As to the Banks' delay in filing the motion to disqualify, the Fifth Circuit has stated, "Since . . . disqualification is in the public interest, the Court cannot act contrary to that interest by permitting a party's delay in moving for disqualification to justify the continuance of a breach of the Code of Professional Responsibility." *In re Corrugated Container, supra* at 1348, quoting *Emle Industries v. Pan Patentex, Inc.,* 478 F.2d 562, 574 (2d Cir.1973). See also *Empire Linotype School, Inc. v. United States,* 143 F.Supp. 627, 631 (S.D. N.Y.1956) (Motion to disqualify made 11 months after filing of action with the case already on trial docket, does not give rise to laches or estoppel defense.) Since the

case law is clear on this subject, GHR's argument that the disqualification motion was not timely filed must be rejected.

As to the consent issue, the Fifth Circuit has stated that "the client may not, by delay or any other action, remove from the court the responsibility of weighing the likelihood of public suspicion of the legal profession when Canon 9 is involved" *In re Corrugated Container Antitrust Litigation, supra* at 1394. In weighing the likelihood of public suspicion of the legal profession, the court went on to say "there may be some situations where the client has so clearly consented that disqualification would raise more public suspicion than it would quell." *Id.* at 1349. There was no evidence presented that Paribas, the client, consented to Christie's employment. The evidence showed that Paribas sent McCabe/Gordon a letter objecting to Christie's employment prior to Christie's commencing work there. Therefore, there is no clear consent as required in this Circuit.

■■■ GHR argues that they effectively screened Christie from all litigation with the Banks. Several courts have recognized a limited exception to firmwide disqualification where the firm can prove that the attorney involved in the first matter has been effectively screened from financial interest and participation in the second case. See, e.g., *LaSalle National Bank v. County of Lake*, 703 F.2d 252, 257–59 (7th Cir. 1983); *Armstrong v. McAlpin*, 625 F.2d 433, 445–46 (2d Cir.1980) (en banc), *vacated on other grounds*, 449 U.S. 1106, 101 S.Ct. 911, 66 L.Ed.2d 835 (1981). Factors to be considered are:

> the size and structural divisions of the law firm involved, the likelihood of contact between the 'infected' attorney and the specific attorneys responsible for the present representation, the existence of rules which prevent the 'infected' attorney from access to relevant files or other information pertaining to the present litigation or which prevent him from sharing in the fees derived from such litigation. The firm must have in place 'specific institutional mechanisms' to block the flow of confidential information.

*Smith v. Whatcott*, 757 F.2d 1098, 1101 (10th Cir.1985) (citations omitted).

Applying the law to the facts, this Court finds no basis in the record that Christie was screened prior to the formal declaration of September 21, 1983. Mr. Gordon admitted that there were no institutional mechanisms in place screening Christie prior to this date (Tr. 91). The size of the McCabe/Gordon firm as well as the access to all data suggests to the Court that Christie was not effectively screened. Additionally, Christie's time records indicate that he was involved with fellow members of McCabe/Gordon and the Cadwalader law firm in litigation which was adverse to the Bank. For the above mentioned reasons, GHR's screening argument must be rejected.

## II.

■■■ The Bank Group argues McCabe/Gordon must be disqualified from representing GHR by virtue of the fact that they are not "disinterested" under 11 U.S.C. § 101(13). Commencing in July, 1980 to date, Gordon and a member of the McCabe/Gordon firm, Richard Wise, have held corporate officerships with GHR. The Banks move to disqualify McCabe/Gordon on this ground and seek the disgorgement of all funds received by the firm. 11 U.S.C. § 327(a) states:

> (a) Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

11 U.S.C. § 327(a) (1984).

A disinterested person is defined as, inter alia, a person that—

> (A) is not a creditor, an equity security holder, or insider;

(B) is not and was not an investment banker for any outstanding security of the debtor;

(C) has not been, within three years before the date of the filing of the petition, an investment banker for a security of the debtor, or an attorney for such an investment banker in connection with the offer, sale, or issuance of a security of the debtor;

(D) is not and was not, within two years before the date of the filing of the petition, a director, officer, or employee of the debtor or of an investment banker specified in subparagraph (B) or (C) of this paragraph; and

(E) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor or an investment banker specified in subparagraph (B) or (C) of this paragraph, or for any other reason;

11 U.S.C. § 101(13) (1984).

The courts have applied a rigid test in determining disinterestness. Collier states § 101(13):

[a]ppears broad enough to include anyone who in the slightest degree might have some interest or relationship that would color the independent and impartial attitude required by the Code.... Indirect or remote associations or affiliations, as well as direct, may engender conflicting loyalties. The purpose of the rule is to prevent even the emergence of a conflict irrespective of the integrity of the person under consideration....

*2 Collier on Bankruptcy*, § 327.03 at 327-19, 20 (15 ed. 1979).

The standards for the employment of professional persons are strict for Congress has determined that strict standards are necessary in light of the unique nature of the bankruptcy process. *In re Cropper Co.*, 35 B.R. 625, 629 (Bankr.M.D.Ga.1983). "[P]rofessionals engaged in the conduct of a bankruptcy case should be free of the slightest personal interest which might be reflected in their decisions concerning matters of the debtor's estate or which might impair the high degree of impartiality and detached judgment expected of them during the course of administration" *In re Philadelphia Athletic Club, Inc.*, 20 B.R. 328, 334 (Bankr.E.D.Pa.1982) quoting *1 Collier Bankruptcy Manual*, § 101.13 (1981).

This Court does not question the McCabe/Gordon firm's representation of GHR to date, however, we have a firm duty to enforce Congress' words as written. McCabe/Gordon must be disqualified pursuant to the definition of disinterested person for they are officers of the debtor. *See In re Leisure Dynamics*, 33 B.R. 121, 123 (Bankr.D.Minn.1983).

The case cited by GHR, *In re Heatron*, 5 B.R. 703 (Bankr.W.D.Mo.1980), is easily distinguishable on its facts. There, the court held that an attorney who has represented the debtors prior to the filing of the bankruptcy proceeding and was therefore a creditor of the estate by virtue of money owed, without any other involvement with the debtor, does not have to be disqualified pursuant to 11 U.S.C. § 1107(b). This section provides:

(b) Notwithstanding section 327(a) of this title, a person is not disqualified for employment under section 327 of this title by a debtor in possession solely because of such person's employment by or representation of the debtor before the commencement of the case.

11 U.S.C. § 1107(b) (1984).

This section and case is inapplicable to the case at bar because it pertains to employment "before commencement of the case." Two members of McCabe/Gordon have held their corporate officerships to the present date.

11 U.S.C. § 328(c) provides:

(c) Except as provided in section 327(c), 327(e), or 1107(b) of this title, the court may deny allowance of compensation for services and reimbursement of expenses of a professional person employed under section 327 or 1103 of this title if, at any

time during such professional person's employment under 327 or 1103 of the title, such professional person is not a disinterested person, or represents or holds an interest adverse to the interest of the estate with respect to the matter on which such professional person is employed.

11 U.S.C. § 328(c) (1984).

The legislative history is clear, "The subsection provides a penalty for conflicts of interest." S.Rep. No. 95–989 (July 14, 1978) *reprinted in* 1978 U.S.Cong. & Ad. News 5787, 5825.

▆▆ From the date of the employment of McCabe/Gordon to the present, the Firm was not disinterested and held an interest adverse to the interests of the estate. All fees were denied in the following bankruptcy cases in which the debtor's attorney was found to not comply with the requirements of 11 U.S.C. § 327(a). See *In re Paine,* 14 B.R. 272 (Bankr.W.D.Mich.1981); *In re B.E.T. Genetics, Inc.,* 35 B.R. 269 (Bankr. E.D.Cal.1983); *In re Chou-Chen Chemicals,* 31 B.R. 842 (Bankr.W.D.Ky.1983). Another ground for compensation denial is failure to comply with the disclosure requirements of the Code and rules. *In re Guy Apple Masonry Contractors, Inc.,* 45 B.R. 160, 168 (Bankr.Az.1984); *In re Haldeman Pipe & Supply Co.,* 417 F.2d 1302, 1304 (9th Cir.1969). Several cases hold that the rule denying all compensation should be relaxed somewhat in Chapter 11 cases. *In Re Devers* 33 B.R. 793 (Bankr.D. D.C.1983), *appeal dismissed,* 729 F.2d 863 (D.C.Cir.1984); *In re King Resources Co.,* 20 B.R. 191 (Bankr.D.Colo.1982). The general rule should be that all fees are denied when an actual conflict is present, see *Woods v. City National Bank,* 312 U.S. 262, 269, 61 S.Ct. 493, 497, 85 L.Ed. 820 (1940) ("Where an actual conflict of interest exists, no more need be shown in this type of case to support a denial of compensation."). Other courts in recent years have not applied this rule in those cases where the need for attorney discipline is outweighed by the equities in the case. *In re Watson Seafood & Poultry*

*Co.,* 40 B.R. 436, 440 (Bankr.E.D.N.C.1984). This latter view is supported by the language of 11 U.S.C. § 328(c) which states that the court *may* (not shall) deny compensation.

Although McCabe/Gordon has produced insubstantial evidence on the equities that would obviate the requirement of total fee denial, "the denial of compensation and reimbursement of expenses after services have been performed may be draconian and inherently unfair. In the absence of actual injury or prejudice to the debtor's estate, this sanction should not be rigidly applied." 2 *Collier on Bankruptcy* § 328.04 at 328–15 (15 ed. 1979). See also *In re Georgetown of Kettering, Ltd.,* 28 B.R. 120, 129 (Bankr.S.D.Ohio 1983) ("As a matter of superintending of estate administration, such apparent harshness must be the rule only if for the protection of estate administration or the benefitted estate creditors.") After a careful analysis of the record, the Court will not deny fees based upon this finding of disinterestedness due to the fact that there is no actual injury or prejudice to the debtor's estate from their continued employment. The Court sees a potential for injury on the basis that McCabe/Gordon's management participation may taint their dealings with unsecured creditors in relation to a plan of reorganization. However, in terms of actual injury to the estate, the record is silent.

The equities of the case, more specifically the fact that Gordon and Wise held these officerships to facilitate the signing of loan documents at the Banks' suggestion, leads the Court to the conclusion that all of McCabe/Gordon's fee should not be denied solely based upon this technical finding of "interestedness." In addition, this Court will defer ruling on the Bank Group's other arguments relating to McCabe/Gordon's fees for the reason that the Banks have filed objections to McCabe/Gordon's interim fee applications and the proper time to consider these objections would be at the hearings on these applications.

Wherefore, it is hereby ORDERED, ADJUDGED, and DECREED pursuant to the

Code of Professional Responsibility and the Bankruptcy Code, and existing case law that:

Christie and McCabe/Gordon be and hereby are disqualified from representation of GHR as of June 6, 1983 with respect to matters involving Paribas herein based on violations of Canons 5 and 9 of the Code of Professional Responsibility; and

McCabe/Gordon be and is not disinterested as required under § 327(a) and must be disqualified for failure to disclose this fact to the Court when it was appointed;

McCabe/Gordon's motion to dismiss the Bank Group's motion is DENIED.